# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| DISTRICT LODGE 26 of the INTERNATIONAL ASSOCIATION of MACHINISTS and AEROSPACE WORKERS, AFL-CIO | CIVIL ACTION NO. |
| Plaintiff, | |
| v. | |
| UNITED TECHNOLOGIES CORPORATION, PRATT & WHITNEY | |
| Defendant. | September 22, 2009 |

## VERIFIED COMPLAINT

INTRODUCTION

     1.    This action is brought pursuant to §301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. §185, seeking injunctive relief and a declaratory judgment pursuant to 28 U.S.C. §2201 and 2202, for the purpose of determining an actual controversy concerning the terms of a collective bargaining agreement between the plaintiff and the defendant.

     2.    Jurisdiction of this Court is conferred by 29 U.S.C. §185(a) and 28 U.S.C. §§1331 and 1337.

     3.    Venue is proper in the District of Connecticut pursuant to 28 U.S.C. §1391(b) because the acts complained of occurred in this district.

PARTIES

4.      The plaintiff, District Lodge 26 of the International Association of Machinists and Aerospace Workers, AFL-CIO (hereinafter "the Union"), is an unincorporated association organized for the purpose of representing employees of employers engaged in commerce, including certain employees of the defendant working at three facilities located in the State of Connecticut.  The Union is a "labor organization" within the meaning of 29 U.S.C. §185(b).  District  26's principal office and place of business is located in Kensington, Connecticut.  District 26 is the exclusive bargaining agent, along with its constituent Local Lodges 700, 1746, and 1746-A for employees at Pratt & Whitney's Connecticut facilities.

5.      The defendant, United Technologies Corporation, Pratt & Whitney ("Pratt & Whitney or "the Company"), is organized and existing under the laws of the State of Delaware, and is authorized to conduct, and does conduct, business within the State of Connecticut.  Pratt & Whitney is an "employer" within the meaning of 29 U.S.C. §152(2) and is engaged in commerce and in an industry "affecting commerce" within the meaning of 29 U.S.C. §§152(6) and (7).

FACTS

6.      On or about December 3, 2007, the Company and the Union entered into a collective bargaining agreement ("the Agreement") which is effective by its terms until midnight, December 5, 2010.  The Agreement establishes the wages, hours and other terms and conditions of employment for certain production and maintenance employees in Pratt & Whitney's Connecticut facilities, as more fully described in Article 2 of that contract, a copy of which is attached hereto as Exhibit A.

- 3 -

7.      Attached to and incorporated in the Agreement are thirty-four "Letters of

Agreement" confirming certain understandings and agreements reached between the

Company and the Union during the contract negotiations.

8.      Letter 22 to the Agreement is entitled "Workplace Guarantees and

Subcontracting," and states, *inter alia*:

> The Company agrees during the life of this Agreement that it will continue
> to employ bargaining unit members at its facilities in East Hartford,
> Middletown, and Cheshire.
>
> Except under the circumstances described in Section 3 hereof, the
> Company will make every reasonable effort to preserve the work presently
> and normally manufactured by employees covered by Article 2 of this
> Agreement.  Therefore, it is not the intent of the Company to use
> subcontractors for the purpose of reducing or transferring work that is
> presently and normally manufactured by employees in the bargaining unit
> nor to place such work in Maine or Georgia, except in those
> circumstances.

(A copy of Letter 22 is attached hereto as Exhibit B)

9.      Letter 22 defines the term "to preserve" as follows:

> ...[t]o refrain from transferring out of the bargaining unit work presently
> and normally manufactured by employees covered by Article 2.  To
> transfer work out of the bargaining unit means discontinuing work
> presently and normally manufactured within the facilities identified in the
> Article where that discontinuance is coupled with the assignment by the
> Company of the same work to a facility not identified in Article 2 (including
> subcontracting the same work to another employer) if such assignment of
> work is not simply a change in the work mix and as a result causes a
> layoff of bargaining unit employees in conjunction with that assignment of
> work.

10.     Letter 22 defines the term "every reasonable effort" as follows:

> ...[p]ursuing actively and in good faith the goal of preserving the work
> presently and normally manufactured by employees covered by Article 2,
> while giving reasonable consideration to the Company's own interests,
> including the profitability of its operations.  The Company will assign extra
> value in its decision-making to choices that preserve such work in the

- 4 -

bargaining unit.  As part of any "meet and confer" process undertaken pursuant to Article 27, the Company will describe the efforts made to comply with this Letter and will provide the Union the opportunity to propose other reasonable efforts, including modifications to the collective bargaining agreement, which the Company will consider in good faith.  In no event will "every reasonable effort" require the Company to make a capital investment, increase the size of the workforce, or require lower profits.

11.     Bargaining unit employees working in the defendant's facility located in Cheshire, Connecticut currently perform the overhaul and repair of aircraft engines. Union workers employed in Pratt & Whitney Connecticut plants have performed production work related to the overhaul and repair of aircraft engines for at least the past 50 years.  Thus, as of the date that Pratt & Whitney signed the Agreement and Letter 22, the work performed at the Cheshire facility constituted "work presently and normally manufactured by employees covered by Article 2" of the Agreement.  This work represents a significant portion of the Company's business and has been a strong profit center over the past several years.

12.     Bargaining unit employees working in the defendant's Connecticut Airfoil Repair Operations (CARO) located in Pratt & Whitney's East Hartford, Connecticut facility currently perform production work related to the repair of turbine airfoils for engines manufactured by the defendant.  Union workers employed in Pratt & Whitney Connecticut plants have performed production work related to the repair of turbine airfoils for at least the past 50 years. Thus, as of the date that Pratt & Whitney signed the Agreement and Letter 22, the work performed at CARO at the East Hartford facility constituted "work presently and normally manufactured by employees covered by

- 5 -

Article 2" of the Agreement.  This work represents a significant portion of the company's business and has been a strong profit center over the past several years.

13.     The work described in paragraphs 11 and 12 above is covered by Letter 22 and does not fall within any of the exceptions described therein.

14.     Article 27 of the Agreement provides, *inter alia*:

> The Company will give notice of its intent to close a plant or transfer a business unit, department, cell, or any part of an operation a minimum of six (6) months in advance of any movement of employees resulting from such intent.  Such notice will include identification of the work to be transferred, the expected decrease in the number of represented employees as direct consequence of the transfer of work and the anticipated date of the transfer of work.

(A copy of Article 27 is attached hereto as Exhibit C)

15.     On July 21, 2009, Pratt & Whitney notified the Union that it has been "evaluating opportunities to eliminate excess capacity within our overhaul and repair network," and that as a result the Cheshire facility "is a likely candidate for closure." The defendant indicated that it expected to begin relocating the overhaul work beginning in the second quarter of 2010, leading to the full closure of the plant in 2011. As of the date of this announcement there were approximately 670 union-represented employees working at the Cheshire facility.  This will also result in the elimination of the jobs of approximately 180 salaried employees.

16.     In a separate letter delivered on July 21, 2009, Pratt & Whitney notified the Union that CARO is also "a likely candidate for closure."  The defendant indicated that it expected to begin relocating turbine airfoil repair work in the first quarter of 2010, leading to the cessation of operations in the second quarter.  As of the date of this

- 6 -

announcement there were approximately 160 union-represented employees working in CARO. This will also result in the elimination of the jobs of approximately 50 salaried employees.

17.     On information and belief, the decisions to close the Cheshire plant and CARO were made long-before July 21, 2009, and the language used in the Article 27 notice suggesting that the decision had not yet been finalized was disingenuous.

18.     The overhaul and repair work presently performed in Cheshire will be relocated to Pratt & Whitney facilities located in Singapore and Columbus, Georgia, while some will be done by United Airlines and Delta in their own facilities. The majority of the Cheshire work, all commercial engines, will be going to Singapore.

19.     The turbine airfoil repair work presently performed in East Hartford will be relocated to Pratt & Whitney facilities in Singapore and Japan.

20.     Both Cheshire and CARO are profitable. Workers in Cheshire were told by Pratt & Whitney management that 2008 was a record year for earnings before income tax (EBIT), that this trend had been continuing during 2009, and just days before the plant closing notice management had thanked the workers for making June 2009 a record month in terms of revenue - $110 Million.

21.     By letter dated July 22, 2009, the Union exercised its right under the Agreement to "meet and confer" over the defendant's decision to close the Cheshire plant and CARO.

22.     At the outset of those meetings, the defendant indicated that a number of alternative scenarios had been considered, but that Pratt & Whitney had determined that the maximum savings could be achieved by closing Cheshire and CARO.

- 7 -

23.     More particularly, Pratt & Whitney told the Union that the Company had calculated that it could save $53.8 Million per year by closing Cheshire and CARO and relocating the work performed in those facilities.

24.     During the "meet and confer" process Pratt & Whitney disclosed information designed to justify its decision, and made self-serving assertions that efforts had been made to preserve the work when, in reality, no good faith effort was made to keep this work in Connecticut.

25.     On or about September 3, 2009, the State of Connecticut announced that it would offer Pratt & Whitney $20 Million per year for the next five years - a total of $100 Million - in return for a commitment to keep Cheshire and CARO open.

26.     During the "meet and confer" process the union made several proposals that would have represented substantial savings and increased profits for the defendant.

27.     On or about September 3, 2009 - three days before the 45 day "meet and confer" process was scheduled to end, Pratt & Whitney told the Union that the decision to close would be reconsidered if the workers would accept a package of concessions that the defendant calculated would save them $53.8 Million per year in "hard dollars." This eleventh hour proposal would have required re-opening the Agreement and extending it for an additional three years, with all bargaining unit employees taking very substantial pay cuts and foregoing raises and other benefit increases, such as pensions, for the next four years.  The proposal did not include any promise of job security for the workers.

- 8 -

28.     At the time it made this proposal, Pratt & Whitney was well aware that the Union could not agree to a three year extension of the Agreement without going through an extensive internal process requiring the participation of negotiating committees from each of the three plants.

29.     Pratt & Whitney's proposal was unreasonable in that it demanded significant concessions from the 2700 workers who would not be impacted by the decision to close Cheshire and CARO.

30.     Pratt & Whitney's proposal was unreasonable in that it went three years beyond the termination date of the Agreement which expires on December 5, 2010.

31.     Pratt & Whitney's proposal was unreasonable in that the Company insisted on a three-year freeze in wages and benefits, but refused to assign any monetary value to that concession.

32.     After receiving Pratt & Whitney's proposal, the Union requested that the "meet & confer" process be extended.  The defendant initially indicated that this request would be rejected, but then agreed to extend the process for one week.

33.     On Friday, September 11, 2009, the parties exchanged final proposals. The Company adjusted the concessions required slightly by crediting the State's $20 Million per year offer as equating to $5 Million of savings.  Thus Pratt & Whitney's final proposal thus demanded, by the company's calculations, $48.8 Million in annual savings from union-represented employees, and included the same structural elements as its initial proposal - a three year contract extension with substantial pay cuts and no raises, and no promises of job security.

- 9 -

34.    Throughout the "meet and confer" process, Pratt & Whitney acted unreasonably by refusing to assign any monetary value to the Union's offer to endorse the UTC Achieving Competitive Excellence (ACE) Program, a productivity and quality program designed to increase profitability for which Pratt & Whitney has been seeking the Union's endorsement for many years.

35.    The Union's final proposal would have provided Pratt & Whitney with $52 Million in what the company termed "hard dollars" and $29.2 Million in other savings, a total of $81.2 Million, in annual savings.  In return for these concessions, the Union simply asked that Pratt & Whitney preserve the work currently performed by bargaining unit employees in Connecticut until  December 5, 2010 - the date the Agreement expires.

36.    The meet and confer process ended with Pratt & Whitney stating that it would consider the proposals that had been made by the Union and the State of Connecticut to save these jobs and would announce its final decision shortly.

37.    On September 21, 2009, Pratt & Whitney announced that it had decided to proceed with its plan to close both Cheshire and CARO, and that the offers made by the Union and the State were insufficient to achieve the savings the Company was looking for.

38.    On information and belief, at some date prior to July 21, 2009, Pratt & Whitney made a determination that the Company could save $53.8 Million annually by relocating the work performed in Cheshire and CARO to facilities in Singapore, Japan and Georgia, and that the decision would not be reconsidered unless the Union could

offer the full amount of those savings in "hard dollars" during the 45 day "meet and confer" period - something that Pratt & Whitney knew full well would not be possible.

39.     The defendant's planned relocation of work will reduce the union-represented workforce from approximately 3,700 employees to 2,870 - a reduction of about 22 percent.  On information and belief, Pratt & Whitney plans to begin implementing this decision on or about January 21, 2010.

40.     Pratt & Whitney did not make "every reasonable effort" to preserve either the Cheshire engine overhaul and repair work or the East Hartford turbine airfoil repair work.

COUNT ONE

41.     The plaintiff repeats, realleges, and incorporates by reference paragraphs 1 through 40 above.

42.     By the actions described above, Pratt & Whitney is in violation of the terms of its collective bargaining agreement with District 26.

43.     If Pratt & Whitney continues to implement the restructuring of its business as described above, there will be no meaningful way to remedy these violations of the collective bargaining agreement.

44.     The Union and its members will suffer irreparable harm unless this Court takes action to prevent such harm by enjoining Pratt & Whitney from implementing its decision to relocate the engine overhaul and repair work performed by employees in the Cheshire facility and the turbine airfoil repair work performed by the CARO employees in East Hartford.

- 11 -

## COUNT TWO

45.     The plaintiff repeats, realleges, and incorporates by reference paragraphs 1 through 44 above.

46.     Letter 22 of the Agreement includes an implied covenant of good faith and fair dealing.

47.     By the acts and conduct described above, Pratt & Whitney has violated its contractual duty of good faith and fair dealing.

48.     The Company's unlawful conduct as described above will cause the Union and its members to suffer irreparable harm unless this Court takes action to prevent such harm.

- 12 -

## DEMAND FOR RELIEF

WHEREFORE, the plaintiff requests that this Court:

1.     Issue a declaratory judgment that Pratt & Whitney's announced plan to close the Cheshire engine overhaul and repair facility and the East Hartford CARO turbine airfoil repair facility and to move that work to locations outside of Connecticut constitutes a breach of Letter 22 to the collective bargaining agreement between Pratt & Whitney and District 26;

2.     Issue a preliminary and permanent injunction prohibiting Pratt & Whitney from implementing its plan to move the engine overhaul and repair work presently and normally manufactured by union-represented employees at the Cheshire facility to locations outside of Connecticut during the term of the collective bargaining agreement;

3.     Issue a preliminary and permanent injunction prohibiting Pratt & Whitney from implementing its plan to move the turbine airfoil repair work presently and normally manufactured by union-represented employees at the East Hartford facility to locations outside of Connecticut during the term of the collective bargaining agreement;

4.     Order the defendant to make whole any bargaining unit employees who have lost wages or benefits as a result of its failure to comply with the terms of the collective bargaining agreement;

5.     Award the plaintiff reasonable attorney's fees and costs incurred in bringing this action;

6.     Grant the plaintiff such other and additional relief as may be just and proper.

- 13 -

THE PLAINTIFF,
DISTRICT LODGE 26 of the INTERNATIONAL
ASSOCIATION OF MACHINISTS AND
AEROSPACE WORKERS, AFL-CIO

By: _____

Gregg D. Adler ct05698
Mary E. Kelly ct07419
Livingston, Adler, Pulda, Meiklejohn
    & Kelly, P.C.
557 Prospect Avenue
Hartford, CT  06015-2922
(860) 233-9821

**ARTICLE 2**
**Coverage**

For the purpose of this Agreement, the term "employee" as used herein shall apply to and include all production and maintenance employees of the United Technologies Corporation, Pratt & Whitney (Connecticut Facilities) at their facilities in and around East Hartford, Middletown, Cheshire, (including the DE Lab, the Willgoos Lab) and other Connecticut locations including inspectors, crib attendants, material handlers, factory clerks (or plant clericals), trainees, apprentices, expeditors and working leaders, but excluding timekeepers, engineering and technical employees, laboratory technicians, foremen's clerks, salaried office and clerical employees, medical department employees, plant protection employees, executives, plant superintendents, division superintendents, general foremen, foremen, assistant foremen, group supervisors, watch engineers, and all other supervisory employees with authority to hire, promote, discharge, discipline or otherwise effect changes in the status of employees, or effectively recommend such action.

## LETTER 22
## Workplace Guarantees and Subcontracting

Mr. James M. Parent
Assistant Directing
    Business Representative
District Lodge No. 26
I.A.M.A.W., AFL-CIO
365 New Britain Road
Kensington, Connecticut 06037

Dear Mr. Parent:

This is to confirm the following understanding and agreement between the Company and the Union concerning workplace guarantees and subcontracting. This letter and Letter 22A supersede and replace all previous agreements on this subject, including the Memorandum of Agreement dated February 15, 2001. The parties agree that the division of this Letter 22 into separate sections is for ease of reference only. No substantive change to Letter 22 is intended by such division or by the labeling of the sections.

Section 1. Workplace Guarantees:

The Company agrees during the life of this Agreement that it will continue to employ bargaining unit members at its facilities in East Hartford, Middletown, and Cheshire.

Section 2.  Subcontracting and Transfer of Production Work

(A)     Except under the circumstances described in Section 3 hereof, the Company will make every reasonable effort to preserve the work presently and normally manufactured by employees covered by Article 2 of this Agreement. Therefore, it is not the intent of the Company to use subcontractors for the purpose of reducing or transferring work that is presently and normally manufactured by employees in the bargaining unit nor to place such work in Maine or Georgia, except in those circumstances.

(B)     The following definitions apply to the interpretation and administration of this Section 2:

(1)     "Work" means activities directly related to the manufacture, assembly, test, repair, over haul, development or inspection of aircraft engines

and parts.   It does not include activities performed by indirect bargaining unit employees, which are covered under Section 3 of this letter.

(2)   (a) "presently and normally manufactured," when applied to original equipment aircraft engines or parts (whether experimental or production), refers to machine operations, assembly, test and similar activities associated with specific products (commonly identified by part numbers) and/or operations for which a sourcing decision has been made by the Company that placed those products and/or operations (or a certain volume thereof) in the Company's Connecticut facilities prior to the effective date of this Agreement;

(b) "presently and normally manufactured," when applied to aftermarket services, refers generally to aircraft engine overhauls and repairs of airfoils, combustors, cases, stators and rotating parts, without regard to specific engine models nor specific parts.

(3)   "to preserve" means to refrain from transferring out of the bargaining unit work presently and normally manufactured by employees covered by Article 2.   To transfer work out of the bargaining unit means discontinuing work presently and normally manufactured within the facilities identified in Article 2 where that discontinuance is coupled with the assignment by the Company of the same work to a facility not identified in Article 2 (including subcontracting the same work to another employer) if such assignment of work is not simply a change in the work mix and as a result causes a layoff of bargaining unit employees in conjunction with that assignment of work.

(4)   "every reasonable effort" means pursuing actively and in good faith the goal of preserving the work presently and normally manufactured by employees covered by Article 2, while giving reasonable consideration to the Company's own interests, including the profitability of its operations.   The Company will assign extra value in its decision-making to choices that preserve such work in the bargaining unit.   As part of any "meet and confer" process undertaken pursuant to Article 27, the Company will describe the efforts made to comply with this Letter and will provide the Union the opportunity to propose other reasonable efforts, including modifications to the collective bargaining agreement, which the Company will consider in good faith.   In no event will "every reasonable effort" require the Company to make a capital investment, increase the size of the workforce, or require lower profits.

(C) Exceptions

The Company is not required to comply with Section 2(A) when:

(1)     Vendor assistance is required to meet schedule demands.  Thirty (30) days, or as soon as practicable, prior to any involuntary reduction in the workforce covered by this Agreement, the Company will meet with the Union and will review the work of the affected facility currently on vendor assistance to discuss the opportunity to return that work to the facility.

(2)     A particular skill and/or specialized equipment is required and not available within the Company.  The Company will also fully explore the availability of the particular skills and/or specialized equipment in other facilities before this decision is made.

(3)     The work is placed outside Pratt & Whitney as a result of partnership agreements, offsets, PMA requirements or joint ventures.

(4)     A product center or similar organization fails to meet Company established productivity and cost reduction goals for two (2) consecutive calendar quarters.  Failure to meet a quarterly productivity or cost reduction goal shall substitute for the notice provided for in Article 27.  Within 90 days of the signing of the prior Agreement, the parties formed a joint committee to review productivity measures, goals and implementation plans.  It is agreed the productivity goals were monitored for a six month period before full implementation.  During that period, the parties had an opportunity to review and modify the measurements.  Any future changes to the resulting measurements will follow a similar procedure.

Section 3.     Subcontracting and Transfer of Non-Production (Indirect) Work

(A)     Both the Company and the Union acknowledge a substantial portion of non-production (indirect) work, including, but not limited to, Facilities & Services, Machine Tool Services, Tool Die & Gage, and Materials work, has been and will continue to be performed by subcontractors.   However, except under the circumstances described in subsection (C) of this Section 3, the Company will make every reasonable effort to preserve the work presently and normally performed by employees covered by Article 2 of this Agreement who are engaged in non-production (indirect) work. Therefore, it is not the intent of the Company to use subcontractors for the purpose of reducing or transferring work that is presently and normally performed by indirect bargaining unit employees, except in those circumstances.

(B)    The terms "to preserve" and "every reasonable effort" as used in this Section 3 are to be interpreted as they are defined in Section 2(B)3 and 2(B)4, respectively, substituting "presently and normally performed" for "presently and normally manufactured."

(C)    Exceptions:

The Company is not required to comply with Section 3(A) when:

     (1)    Subcontracting assistance is required to meet schedule demands.

     (2)    A particular skill and/or specialized equipment is required and not available within the Company.  The Company will also fully explore the availability of the particular skills and/or specialized equipment in other facilities before this decision is made.

     (3)    Non-production work is reduced, transferred, subcontracted or eliminated as the result of the elimination or transfer of production work that is covered by Section 2.

     (4)    Non-production work is reduced, transferred, subcontracted or eliminated as a direct result of the introduction of new technology.

In the case of the application of any of the foregoing exceptions, the provisions of Article 27 will continue to apply, according to its terms.

(D)    A joint committee consisting of the Directing Business Representative of District 26 or his/her designee, the Presidents of each Local Lodge and the Vice President, Industrial Relations or his/her designee, an equal number of other Company representatives and other mutually agreed upon individuals will begin meeting during the first quarter of 2008 to study the means and implement a process that will allow the Union to bid on Plant Engineering work that the Company intends to subcontract or transfer.  It is the goal of this committee to have a process in place by the end of the third quarter in 2008.

Section 4.  Additional Severance

In the event an employee is laid off as a direct result of work placed outside Pratt & Whitney to satisfy partnership agreements, offset, PMA requirements and/or joint ventures, the employee will receive the following benefits: contractual severance pay, a $5,000 lump sum payment and six (6) months of medical and dental insurance coverage for the employee and his or her dependents (one year coverage if the employee is retirement eligible); however, the insurance coverage shall not be additive.

Section 5.  Product Center Joint Committees

(A)    The parties agree that a four member joint committee will be established for each product center or similar organization.   The membership of this joint committee will consist of the Product Center General Manager, the Manager, Human Resources, a Business Representative, and the President of the applicable Local Lodge or their designee.  The committee will meet on a monthly basis (subject to mutual agreement to cancel) to review any issues arising out of the above, in addition to productivity, training and cost reduction.

(B)    Prior to each such meeting, the Company will provide the Union a list of all covered work being subcontracted pursuant to the "vendor assistance" exception. This list will specify the part and part number, the date the part was sent out to the vendor, the reason the part was sent out to the vendor, the work being done on the part by the vendor and the date the part is scheduled to return to the Product Center.  At the meeting, the Company will be prepared to review and discuss all information provided to the Union.

(C)    To facilitate the Product Center review meetings, the parties agree to the following guidelines for discussing temporary vendor assistance:

      (1) If parts are to be subcontracted for a period longer than ninety (90) days, the Company will advise the Union at a meeting of the Product Center joint committee and will explain the reasons therefore and the expected duration. Where business conditions permit, the Company will provide the Union this notice prior to subcontracting.

      (2) The parties recognize that where a part or parts are subcontracted for more than ninety (90) days, there may be disagreements about whether or not such subcontracting should come within the "vendor assistance" exception.  However, the parties further recognize from experience that it is in their mutual interest to resolve such disagreements through the joint committee process and will continue to do so.

(D)    At these meetings, the Company will also discuss with the Union any plans to off load existing work as the result of any partnership agreements, offsets, PMA requirements or joint ventures.

Section 6.  Structure of the Business

Nothing in this Letter shall require the Company to increase its manufacturing, overhaul or repair capacity in Connecticut nor limit the right of the Company to

change the business structure of its operations, including, without limitation, the sale or purchase of assets, mergers, joint ventures, partnerships and the like.

Section 7.  Dispute Resolution

Any disputes concerning workplace guarantees and subcontracting are not subject to the grievance procedure including arbitration.  If a difference arises over the issues of subcontracting/workplace guarantees, productivity, training or cost reduction, it will be referred to and discussed by the Executive Steering Committee at their next regularly scheduled meeting.

Sincerely,


Richard A. Warters
Vice President, Industrial Relations


Accepted this 3rd day of December 2007


_____

# ARTICLE 27
## Transfer of Ongoing Production/Non-Production Work

*Section 1.*    The Company will give notice of its intent to close a plant or transfer a business unit, department, cell, or any part of an operation a minimum of six (6) months in advance of any movement of employees resulting from such intent. Such notice will include identification of the work to be transferred, the expected decrease in the number of represented employees as a direct consequence of the transfer of work and the anticipated date of the transfer of work. With the mutual consent of the Union (only for extreme business conditions) in the event the Company cannot meet its obligation of the six (6) month notice, the Company will provide the affected employees with either alternate work or pay and benefits for part or all of the six (6) month notice period. However, the Company will still be required to comply with Sections 2 and 3 of this Article.

*Section 2.*    If the Union requests to meet and confer within ten (10) working days following the notice set forth above, the Company will be available to meet and confer with the Union within five (5) working days of such request. The period for meeting and conferring shall not exceed forty-five (45) days except by mutual agreement. The final decision regarding closing a plant or transferring a business unit rests solely with the Company.

*Section 3.*    If information is requested by the Union for the meet and confer session(s), the Company will promptly make the following information available to the Union: the express reason(s) for intending to transfer the work and, where employment cost is a significant factor, comparative related wages, payroll allowances and employee benefit expenses of represented employees for the work intended to be transferred and of their counterparts who would be assigned the work. This information will be treated as confidential by the Union.

*Section 4.*    The Company will give notice of its intent to transfer or subcontract non-production work a minimum of six (6) months in advance of any movement of employees resulting from such intent. Such notice will include identification of work to be transferred or subcontracted, the expected decrease in the number of represented employees as a direct consequence of the transfer or subcontracting of work, and the anticipated date of the transfer or subcontracting of work. In the event the Company cannot meet its obligation of the six (6) month notice, the Company will provide the affected employees with either alternate work or pay and benefits for part or all of the six (6) month notice period. However, the Company will still be required to comply with Sections 5 and 6 of this Article.

*Section 5.*    If the Union requests to meet and confer within ten (10) working days following the notice set forth above, the Company will be available to meet and confer with the Union within five (5) working days of such request. The period for

meeting and conferring shall not exceed forty-five (45) days except by mutual agreement. The final decision regarding closing a plant or transferring a business unit rests solely with the Company.

*Section 6.*     If information is requested by the Union for the meet and confer session(s), the Company will promptly make the following information available to the Union. The information will specifically include express reason(s) for intending to subcontract or transfer the work and where employment cost is a significant factor, comparative related wages, payroll allowances and employee benefit expenses of represented employees for the work intended to be subcontracted or transferred and of their counterparts who would be assigned the work. This information will be treated as confidential by the Union.

## **VERIFICATION**

I, James Parent, Assistant Directing Business Representative for District Lodge 26 of the International Association of Machinists and Aerospace Workers, AFL-CIO, hereby verify that I have read the foregoing complaint and that it is true and correct to the best of my knowledge and belief.


_James M. Parent_
James Parent


Sworn and subscribed to before me on this 22nd day of September, 2009.


Commissioner of the Superior Court