**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| DISTRICT LODGE 26 of the | : | CIVIL ACTION NO. |
| INTERNATIONAL ASSOCIATION OF | : | 3:09-cv-1494 (JCH) |
| MACHINISTS AND AEROSPACE | : | |
| WORKERS, AFL-CIO, | : | |
|     Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| UNITED TECHNOLOGIES | : | FEBRUARY 17, 2010 |
| CORPORATION, PRATT & WHITNEY, | : | |
|     Defendant. | : | |

**AMENDED BENCH TRIAL RULING[1]**

## I.    INTRODUCTION

The plaintiff, District Lodge 26 of the International Association of Machinists and

Aerospace Workers, AFL-CIO ("District 26"), brings this action against defendant United

Technologies Corporation, Pratt & Whitney ("Pratt"), alleging that Pratt's proposed

restructuring plans violate the parties' collective bargaining agreement ("CBA," or

"Agreement") in two respects.  First, District 26 claims that Pratt's plan for the transfer of

work from, and closure of, its Cheshire Engine Center ("Cheshire") and its Connecticut

---

[1] This Amended Ruling is issued because the original February 5, 2010 Ruling cited Exhibit 58, a document submitted to the court before trial that was not objected to by the defendant, but that was not admitted into evidence.  See Bench Trial Ruling (Doc. No. 67) at 58-59, 80.  Pratt and District 26 each offered numerous exhibits at the close of trial that had not been raised during witness testimony, which the court admitted.  However, Exhibit 58 was apparently mistakenly not included among those exhibits by District 26.  See Trial Transcript ("Tr.") at 1154-55.  Nonetheless, District 26 quoted and cited Exhibit 58 in its post-trial submission.  See Plaintiff's Proposed Findings of Fact and Conclusions of Law (Doc. No. 57) at 54.

Upon realizing that it had cited to a document not marked as an exhibit, the court inquired of counsel if there was an objection to the court's reliance on Exhibit 58.  Pratt did object.  In light of this, the court reconsidered the issues before it by reevaluating the evidence contained in the record, without reliance on Exhibit 58.  This Amended Ruling is the result of that reevaluation and reconsideration.

Airfoils Repair Operations ("CARO"), before the termination of the CBA, violates Letter

22 of the CBA.  Letter 22 provides that Pratt will make "every reasonable effort" to keep

certain work within the bargaining unit.  Second, District 26 claims that these same

plans for transfer and closure violate the CBA's implied covenant of good faith and fair

dealing.

The case was tried to the court for five days between December 21, 2009 and

January 13, 2010.[2]  Final post-trial submissions were received on January 15, 2010.

Oral argument was held on January 27, 2010.   Pursuant to Rule 52 of the Federal

Rules of Civil Procedure, the court's findings of fact and conclusions of law are set forth

below.  Based upon these findings, the court concludes that Pratt has breached its

obligations both under Letter 22 of the CBA and under the implied covenant of good

faith and fair dealing.

II.     **BACKGROUND**[3]

A.     Parties

The defendant, United Technologies Corporation, is organized under the laws of

the State of Delaware and is authorized to conduct, and does conduct, business within

the State of Connecticut.  Pratt & Whitney is an unincorporated division of United

Technologies Corporation ("UTC").  Pratt is an "employer" within the meaning of 29

---

[2] District 26 originally moved for a preliminary injunction.  See Mot. for Preliminary Injunction (Doc. No. 5).  With the consent of the parties, the court consolidated a hearing on that Motion with trial on the merits of District 26's claim for injunctive relief.  See Fed. R. Civ. P. 65(a)(2).

[3] Many of the facts stated herein have been stipulated to by the parties.  See Amended Stipulations (Doc. No. 55).  Unless otherwise indicated, the facts set forth in this section are facts found by the court based on evidence in the record, the lack of evidence in the record, and the court's assessment of witness credibility.  To the extent there is evidence to the contrary, the court has rejected it.

U.S.C. § 152(2), and it is engaged in "commerce" and is in an industry "affecting commerce" within the meaning of 29 U.S.C. §§ 152 (6) and (7).  Pratt is a world leader in the design, manufacture, and sale of both commercial and military aircraft engines. Pratt also performs maintenance, repair, and overhaul ("MRO") of both its commercial and military products.

Pratt's fleet of installed, large commercial jet engines is the oldest of the major commercial jet engine manufacturers.  Between 2002 and 2007, Pratt's market share of installed, large commercial jet engines declined.  In 2009, of the three major commercial jet engine manufacturers, Pratt was third in terms of delivery of new, large commercial jet engines.  Between 2009 through 2014, Pratt's share of installed, large commercial jet engines are projected to decline.  With respect to commercial jet engine overhaul and repair, worldwide MRO recovery from the economic recession is projected to occur sooner in Asia than in America.

District 26 is an unincorporated association organized for the purpose of representing employees of employers engaged in commerce, including certain employees of the defendant.  Its principal office and place of business is located in Kensington, Connecticut.  District 26 is the exclusive bargaining agent, along with its constituent Local Lodges 700, 1746, and 1746-A, for employees at Pratt facilities in Connecticut.  Specifically, it represents all production and maintenance employees at Pratt facilities in East Hartford, Middletown, Cheshire, and other Connecticut locations ("ConnOps").  District 26 is a "labor organization" within the meaning of 29 U.S.C. §185(b).  Therefore, this court has jurisdiction over this matter pursuant to 29 U.S.C. § 185(a).

Two Pratt facilities that are represented by District 26 are the subject of this litigation. Pratt's Cheshire Engine Center ("Cheshire") employs bargaining unit employees that perform overhaul and repair work on both commercial and military engines. Currently, Cheshire bargaining unit employees perform overhauls of Pratt's PW2000 and PW4000 series commercial engines and overhauls of the F117 military engine. Pratt also performs engine overhaul and repair at other facilities, including a facility in Columbus, Georgia known as the Columbus Engine Center ("CEC" or "Columbus"), and a joint venture facility in Singapore known as Eagle Services Asia ("ESA"). Connecticut Airfoils Repair Operations ("CARO"), located in East Hartford, employs bargaining unit employees who primarily perform turbine airfoil repairs, including repair work on blades and vanes for various commercial and military engines, and also perform certain coating operations in support of the turbine airfoils that it services. Pratt also performs turbine airfoil repair, including coating work, at other facilities, including a facility in Dallas known as the Dallas Airfoil Repair Operations ("DARO"), and joint venture facilities in Japan known as Japan Turbine Technologies ("JTT") and Singapore known as Turbine Overhaul Services ("TOS"). Under the terms of the restructuring plans that Pratt announced in July 2009, Pratt will begin transferring work out of Cheshire and CARO in late January 2010,[4] with final closure of these facilities occurring at different times in 2010 and 2011.

B.   The 2007 Collective Bargaining Agreement

The parties have had a collective bargaining relationship since the early 1940s.

---

[4] When the parties jointly requested a delay in the commencement of trial, Pratt agreed to forestall commencement of its restructuring plan to await this court's Ruling.

-4-

On December 3, 2007, Pratt and District 26 entered into their current CBA, which is effective by its terms until midnight on December 5, 2010.  UTC is a named party to the Agreement.

The agreement contains the following relevant provisions.  Article 1, entitled "Management Functions," provides:

> It is recognized that in addition to other functions and responsibilities, the Company has and will retain the sole right and responsibility to direct the operations of the Company and in this connection to determine the number and location of its plants; the product to be manufactured; the types of work to be performed; the assignment of all work to employees or other persons; the schedules of production; shift schedules and hours of work; the methods, processes and means of manufacturing; and to select, hire, and demote employees, including the right to make and apply rules and regulations for production, discipline, efficiency, and safety unless otherwise hereinafter provided.

Collective Bargaining Agreement ("CBA"), Ex. 1 at Art. 1.

Article 24 of the CBA relates to strike or lockout, and it states in relevant part:

> The Union will not call or sanction any strike, sympathy strike, sitdown, slowdown, other concerted stoppage of work, or picketing of the Company's plant by employees of the Company during the period of this Agreement.  The Company agrees that there will not be a lockout of employees.

Id. at Art. 24.

Article 27 of the CBA details the procedures that Pratt has agreed to follow if it seeks to close a plant or transfer a business unit, department, cell, or any part of an operation governed by the CBA.  Id. at Art. 27.  Section 1 provides that Pratt will give notice of its intent to close a plant or transfer, "a minimum of six (6) months in advance of any movement of employees resulting from such intent."  Id. at Art. 27 § 1.  Section 1 further provides that this "notice will include identification of the work to be transferred,

the expected decrease in the number of represented employees as a direct

consequence of the transfer of work and the anticipated date of the transfer of work."

Id.  If, upon receiving such notice, District 26 requests to meet and confer with Pratt

within ten (10) working days, Pratt shall make itself available to meet and confer within

five (5) days of that request.  Id. at Art. 27 § 2.  The CBA provides that the meet and

confer period shall not last longer than forty-five (45) days except by mutual agreement.

Id.  Further, if District 26 requests information during the meet and confer session or

sessions,

> the Company will promptly make the following information
> available to the Union: the express reason(s) for intending to
> transfer the work and, where employment cost is a significant
> factor, comparative related wages, payroll allowances and
> employee benefit expenses of represented employees for the
> work intended to be transferred and of their counterparts who
> would be assigned the work.

Id. at Art. 27 § 3.  Article 27 also provides: "The final decision regarding closing a plant

or transferring a business unit rests solely with the Company."  Id. at Art. 27 § 2.

Article 30 governs the duration of the CBA.  It states: "This Agreement shall be in

full force and effect until midnight, December 5, 2010, and for additional periods of one

(1) year thereafter unless either party hereto shall give written notice of its intent to

terminate the Agreement or modify any portion or any of the terms hereof . . . ."  Id. at

Art. 30 § 1.

In addition to these articles, attached to and incorporated in the CBA are thirty-

four "Letters of Agreement" that confirm certain understandings and agreements

reached between Pratt and District 26.  Letter 21 provides for the continued existence

of the Executive Steering Committee in order to enable the parties "to communicate

with each other concerning the issues of job security, productivity, workforce flexibility, training and cost reduction."  Id. at Letter 21.  Consisting of members of both Pratt and District 26, this committee is to meet at least once monthly.  Id.

At the center of this litigation is Letter 22, entitled "Workplace Guarantees and Subcontracting."  This Letter provides:

> The Company agrees during the life of this Agreement that it will continue to employ bargaining unit members at its facilities in East Hartford, Middletown, and Cheshire . . . . Except under the circumstances described in Section 3 hereof, the Company will make every reasonable effort to preserve the work presently and normally manufactured by employees covered by Article 2 of this Agreement.  Therefore, it is not the intent of the Company to use subcontractors for the purpose of reducing or transferring work that is presently and normally manufactured by employees in the bargaining unit nor to place such work in Maine or Georgia, except in those circumstances.

Id. at Letter 22 § 2(A).  The parties have stipulated that the work performed at both CARO and Cheshire constitutes "work presently and normally manufactured by employees covered by Article 2," and is therefore subject to the provisions of Letter 22. See Amended Stipulations (Doc. No. 55) at ¶ 17.

Also included in Letter 22 are several definitions of its particular terms that are of crucial importance to the issues currently before the court.  These definitions were first incorporated into the CBA during the 2001 contract negotiations, and they were implemented largely in response to the outcome of the appeal of litigation before this court in 2000.[5]  First, Letter 22 defines "every reasonable effort" as:

---

[5] In that case, Aeronautical Indus. Dist. Lodge 91 of the Int'l Ass'n of Machinists and Aerospace Workers, AFL-CIO v. United Tech. Corp., Pratt & Whitney, 87 F. Supp. 2d 116 (D. Conn. 2000), the Machinists' Union also challenged a proposal by Pratt to move engine repair work out of Connecticut as a violation of the collective bargaining agreement that was then in effect.  This court issued a Bench Ruling that concluded Pratt had failed to make "every effort" to keep work within the bargaining unit.  The

> [P]ursuing actively and in good faith the goal of preserving the work presently and normally manufactured by employees covered by Article 2, while giving reasonable consideration to the Company's own interests, including the profitability of its operations. The Company will assign extra value in its decision-making to choices that preserve such work in the bargaining unit. As part of any "meet and confer" process undertaken pursuant to Article 27, the Company will describe the efforts made to comply with this Letter and will provide the Union the opportunity to propose other reasonable efforts, including modifications to the collective bargaining agreement, which the Company will consider in good faith. In no event will "every reasonable effort" require the Company to make a capital investment, increase the size of the workforce, or require lower profits.

Id. at Letter 22 § 2(B)(4).  Second, Letter 22 defines "to preserve" as:

> [T]o refrain from transferring out of the bargaining unit work

---

judgment was affirmed by the Court of Appeals for the Second Circuit.  <u>Aeronautical Indus. Dist. Lodge 91 of the Int'l Ass'n of Machinists and Aerospace Workers, AFL-CIO  v. United Tech. Corp., Pratt & Whitney</u>, 230 F.3d 569 (2d Cir. 2000).  Specifically, the Second Circuit stated:

> Based on cases interpreting "best efforts" language in other contexts, we think Pratt must "active[ly]" and "in good faith" pursue the goal of maintaining bargaining unit work . . . .  While it may certainly "give reasonable consideration to its own interests" and need not "spend itself into bankruptcy" in order to achieve the contractually mandated goal . . . it may not pursue its own profit "without fair consideration of the effect" . . . on bargaining unit work.  In other words, Pratt must "at least . . . explore whether steps not involving substantial losses could have been taken" to avoid or "at least lessen" the negative impact on bargaining unit work . . . .  However, we do not suggest that it is necessary, as the district court found . . . for Pratt to accept significantly lower profits, or even losses, before transferring work . . . .  Under our interpretation of "every effort," Pratt has not met the obligation imposed by Letter 22 . . . .

> We will not attempt to delineate with precision what actions would fulfill the Company's obligation to make all reasonable efforts to preserve bargaining unit work.  Nevertheless, we believe that, consistent with the foregoing analysis, indications that the Company has made serious efforts might include: (1) a weighing of restructuring options that explicitly took workforce preservation into account as a separate and important value; (2) good-faith pursuit of reasonable concessions from the Union or the State that would reduce or eliminate the financial need to transfer work out of Connecticut; and (3) a showing that transferring less than the planned amount of work out of Connecticut would entail serious financial consequences.

Id. at 578-79 (citations omitted).  The Circuit Court's opinion also provides historical background on the development of Letter 22.

> presently and normally manufactured by employees covered by Article 2.  To transfer work out of the bargaining unit means discontinuing work presently and normally manufactured within the facilities identified in Article 2 where that discontinuance is coupled with the assignment by the Company of the same work to a facility not identified in Article 2 (including subcontracting the same work to another employer) if such assignment of work is not simply a change in the work mix and as a result causes a layoff of bargaining unit employees in conjunction with that assignment of work.

Id. at Letter 22 § 2(B)(3).  The parties stipulate, and the court finds, that Pratt's restructuring plan for Cheshire and CARO constitutes "transferring work" as defined in Letter 22 § 2(B)(3).

Pratt concedes that its otherwise absolute right as a company to close a facility and transfer work to another plant under Article 1 of the CBA is subject to, and limited by, Article 27 and Letter 22.  Further, the court finds that District 26 surrendered its right to strike in Article 24 in exchange for Letter 22.  Letter 22 is a very important component of the collective bargaining agreement to District 26 and its members.  Moreover, Pratt understood the significance of Letter 22 to District 26.  See Trial Transcript ("Tr.") at 248-49, 958-59.

C.   The Restructuring Plans

On July 21, 2009, and pursuant to Article 27 of the CBA, Pratt notified District 26 that it had approved plans for closing its Cheshire and CARO facilities.  Under the plan to close Cheshire, Pratt will begin relocating overhaul work to the ESA and CEC facilities in the second quarter of 2010, with closure of operations occurring in 2011.  If implemented, the Cheshire closure plan would eliminate the jobs of the approximately 669 collective bargaining unit employees that currently work at the facility.  Under the

plan to close CARO, Pratt will begin relocating turbine airfoil repair work from the CARO facility to DARO, TOS, and JTT in the first quarter of 2010.  The cessation of CARO operations is scheduled for the second quarter of 2010.  Implementation of the CARO closure plan would eliminate the jobs of the approximately 163 collective bargaining unit employees currently employed at CARO.

Cheshire and CARO are each part of Pratt's worldwide aftermarket overhaul and repair business that services airplane engines and, for the most part, Pratt considered and implemented the plan to close the two facilities as a single restructuring plan.  For that reason, the court will generally address together Pratt's actions with respect to the closure of the two facilities.  Nonetheless, in many respects Cheshire and CARO are managed independently of one another.  For instance, even though Todd Kallman, Pratt's President of Commercial Engine and Global Services, ultimately reports on both facilities to Pratt's President, the Cheshire facility is under the direct supervision of Thomas Mayes, Vice President for Commercial Engines and Global Services, while CARO is under the direct supervision of Thomas Hutton, Vice President of Global Repair Services.  As a consequence of there being different managers for each facility, the initial formulation of the closure plans were made largely independent of each other.  Therefore, although the court will mostly address the two restructuring plans together, it is necessary to describe separately the origins of the Cheshire and CARO plans.

1.      Development of Plan to Close Cheshire

Generally, Cheshire has historically performed less well than other Pratt engine repair facilities.  Cheshire has had a low return on sales ("ROS") and a higher overall cost of operation than other Pratt engine overhaul centers; it also has had trouble

meeting targets for on-time delivery and "cost of poor quality."  <u>See</u> Ex. 546 at 12.
These problems were in existence well before Pratt entered into the current CBA in
December of 2007.  In 2005, 2006, and 2007, for example, despite having the highest
levels of sales and manpower among Pratt's main engine overhaul facilities (Cheshire,
CEC, and ESA), Cheshire had the lowest earnings before interest and taxes ("EBIT"),
and the lowest ROS.  <u>See id.</u>  Cheshire's comparatively low profitability was attributable
mainly to the high labor costs associated with that facility.  Additionally, Cheshire's on-
time delivery was 26% in 2007, compared with approximately 85% for ESA and 94-95%
for CEC.

 Although performance has historically been weaker at Cheshire than other
facilities, significant improvements have been made between 2007 and the present.
On-time delivery, for example, has increased from 26% in July 2007 to 80-85%
presently.  These improvements have enhanced Cheshire's profitability.  In 2008,
Cheshire operated at capacity and at a profit, and even posted EBIT of $14.1 million, a
plant record.  This enhanced performance led Pratt to routinely offer positive feedback
about Cheshire to District 26 during Executive Steering Committee meetings in 2008
and 2009.

 In May or June 2008, Pratt began considering the possibility of changing the
amount or nature of the work performed at Cheshire in order to improve Cheshire's
performance relative to its peer engine overhaul centers.  This decision was at least
partially motivated by the fact that, despite improvements in the facility's performance,
Cheshire continued to lag behind ESA and CEC across numerous metrics, specifically
its comparatively low ROS.  Moreover, beginning in July 2008, Pratt perceived a

significant threat to volume in Cheshire starting in 2010.  Among the reasons for this threat were the severe downturn in the economy generally, as well as the merger of Delta Airlines with Northwest Airlines.[6]  The non-renewal of a contract with UPS due to customer dissatisfaction in October 2008 also impacted Cheshire's volume projections. This perceived threat of volume loss was realized: although Cheshire operated at capacity for 2008 and the first three quarters of 2009, in the last quarter of 2009 Cheshire began to experience excess capacity.

One of the alternatives that Pratt began considering in May or June 2008 was the plan that Pratt is currently seeking to implement: closure of the Cheshire plant and transfer of the Cheshire work to Singapore and Georgia.  The other alternatives nominally considered included: (1) closing Cheshire and moving work to Pratt's Middletown facility, which is part of the District 26 collective bargaining unit; (2) reducing the number of product lines at Cheshire in order to increase "focus and productivity," and (3) allowing volume to reduce by attrition, i.e., not renewing Pratt's contracts with its customers.  Many of these alternatives impacted the collective bargaining agreement.

Mayes first recommended a long-term strategy of closing Cheshire to his superiors at Pratt in July 2008.  He rejected the other three Cheshire restructuring alternatives because they did not offer equivalent financial returns.  Mayes' team estimated in August 2008 that closing Cheshire and moving its work to Singapore and Columbus would require a $93 million capital investment and would generate an increase in annual EBIT of $35 million beginning in 2011.  See generally Ex. 11 at 18.

---

[6] Pratt had a contract with Northwest Airlines that was cancelled by agreement after Northwest Airlines merged with Delta, an airline that operates its own engine repair facility.

The five-year, net present value (NPV) of this approach was forecasted to be $8,845,674, and the ten-year NPV was forecasted to be $58,269,040.[7]  In considering these options and in making the decision to recommend closure, Mayes did not take workforce preservation into account as a separate and important value.[8]  Indeed, he did not consider it at all.  Between July 2008 and March 2009, Mayes and his team generated numerous reports that addressed the long-term strategy proposal of closing Cheshire.  See, e.g., Exs. 9-12, 15.  Although the specific calculations in these documents changed over time due to changes in the assumptions of Pratt's financial analysis, Mayes never waivered from his initial recommendation to close Cheshire.

While Mayes was set on recommending a long-term strategy of closing Cheshire as of July 2008, the short-term strategy he formulated at that time was to increase the performance and productivity of the plant.  Pratt took steps towards these ends: it attempted to reduce labor costs by reducing the salaried employee (non-Union) head count and improving bargaining unit employee efficiency; it continued to attempt to grow the business by pursuing additional customers and work; it reduced inventory; it invested in additional tooling; and, it attempted to reinvigorate the plant with a new management team in 2008.  These measures positively influenced performance: the ROS for Cheshire doubled from 2007 to late 2009.  These positive outcomes, however, did not alter Mayes' position: he did not waiver in his recommendation of a long-term

---

[7]  It was not uncommon for Pratt to formulate long-term plans such as this one.  Kallman testified that Pratt typically looks "at five years, and then we also look beyond what's going to happen to the business, what are the long-term [things] that we need to assess to make sure that we can stay competitive in the long-term."  Tr. at 620.

[8]  Mayes never actually read Letter 22.  He relied only on whatever advice Richard Warters, Pratt's Vice President of Industrial Relations, offered.

strategy of closure.

The other members of Pratt's executive team agreed with Mayes' long-term recommendation to close Cheshire at various points in 2008 and 2009.  By January of 2009, Kallman supported the closure strategy.  By January 15, 2009, John Tokarz (Pratt's Vice President of Finance), Rajeev Bhalla (Pratt's CFO), and Elizabeth Amato (Pratt's Vice President of Human Resources) were all in support of the closure plan.  Although Kallman testified that Pratt's President, David Hess, supported the closure plan as of January 2009, Hess contends, and the court finds, that he did not conclude that Cheshire should be closed until after January.

On or about February 13, 2009, Pratt officers met with UTC to present potential restructuring projects and to seek funding for those projects.[9]  At this meeting, Pratt listed its restructuring objectives as including: (1) respond to market conditions; (2) reduce cost to invest in future programs; (3) maintain shareholder confidence; (4) retain all levels of political support; (5) obtain UTC support; and (6) experience little or no disruption to the workforce.  See Ex. 28.  One of the projects included in Pratt's proposal to UTC was the current plan to close Cheshire and move operations to CEC and ESA.  At this time, Pratt told UTC that this Cheshire closure plan would require an initial investment of $110 million and was forecasted to eventually achieve an annual savings of $43 million; the payback period was identified at that time as 2.2 years.[10]  In

---

[9]  As a division of UTC, Pratt had no ability to execute a restructuring plan until UTC approved making restructuring investment monies available.

[10]  By the final calculations, the annual savings were forecasted to be $33.6 million, and the payback period -- the period after which the cash returns are projected to exceed the investment -- had grown to 3.6 years.  See Ex. 546 at 19.

its February 2009 presentation to UTC, Pratt also included a list of alternative Cheshire plans. These included: (1) Cheshire as a one model facility, with moving the PW4000 to ESA; (2) Cheshire as a one model facility, with the PW4000 being split between Middletown and ESA; (3) Cheshire as a two model facility, with one type of PW4000 operations moving to ESA; (4) closure of Cheshire, with operations split amongst Middletown, ESA, and CEC; and (5) closure of Cheshire, with operations split amongst UAL (United Airlines), ESA, and CEC. These alternatives were not forecasted to generate as much EBIT savings over a recurring period as the closure plan Pratt recommended, and Pratt did not pursue funding for these alternate programs. Neither Hess, Kallman, Tokarz, Bhalla, nor Amato considered workforce preservation as a separate and important value in weighing their options or in reaching their decisions to support the closure plan that Pratt is now pursuing.

The Board of Directors of UTC approved the funding restructuring plans, including the Cheshire closure plan, on March 10, 2009. As revealed in a June 24, 2009 email exchange between Pratt and UTC officials, Pratt believed that UTC had informally given its approval to announce the closure of Cheshire subject to "Pratt's ability to complete the transition . . . before the start of the 2010 labor negotiations." See Ex. 40. At some point in June or July 2009, official approval was given to announce the closure plan. In weighing the closure plan and its alternatives, UTC did not assign any extra value to workforce preservation and did not pursue the goal of preserving Cheshire jobs in its decision-making.

Although Pratt was considering closure as early as Summer 2008, Pratt did not communicate the existence of any closure plan to District 26 until July 21, 2009. The

issue of whether there existed a plan to close Cheshire arose at two meetings between Pratt and District 26 prior to July 21.  First, at a February 2009 meeting, Wayne McCarthy, President of Local 1746A, the division of District 26 that represents Cheshire employees, specifically asked Pratt's representatives present at the meeting whether there existed a plan to close Cheshire.  Pratt's Warters responded that Pratt looked at everything all the time, and that there was no bigger review for Cheshire than there had ever been.  Second, after receiving in April 2009 what appeared to be a Pratt document that contained timelines for closing Cheshire and CARO, James Parent, President of District Lodge 26, asked Warters if there was a plan to close Cheshire.  Warters indicated that, while the CARO situation had the potential to produce an official notice of closure in 2009 and might "ruin their summer," Cheshire appeared busy and "not in danger."  At the time he made these statements, Warters was aware of the plan to close Cheshire.  Indeed, the UTC Board had already approved the plan to close Cheshire.

By letter dated July 21, 2009 and pursuant to Article 27 of the CBA, Pratt notified District 26 that it had been "evaluating opportunities to eliminate excess capacity within our overhaul and repair network" and that Cheshire was a "likely candidate for closure." Ex. 72.  In a July 22, 2009 letter, District 26 exercised its right under Article 27 of the CBA to "meet and confer" regarding the decision to close the Cheshire plant.

### 2. Development of Plan to Close CARO

Pratt began considering the possibility of changing the amount or nature of the work performed in CARO during October 2007.  At that time, CARO's performance was one of the poorest of Pratt's sixteen component repair shops.  While on-time

delivery among other shops was above 85%, CARO was operating at a mid-50% rate for on-time delivery, which negatively impacted relations with some customers. See Ex. 501 at 5. Furthermore, Pratt's other turbine airfoil units were achieving a ROS of nearly twice as much as that which CARO was achieving. Among the factors that contributed to these poor results were both the fact that Pratt had increased sales at CARO while it simultaneously reduced the number of hourly employees available to perform work, and the fact that Pratt had more heavily invested in TOS.

One of the strategies that Pratt began considering in October 2007, before Pratt entered into the current CBA, was closing CARO and moving portions of its work to DARO, JTT, and TOS. Other alternative restructuring plans for Pratt's repair services division were also considered: (1) maintaining CARO's current operations; (2) closing DARO; (3) growing operations at CARO; and (4) scaling down operations at CARO. Ex. 501 at 14. Although at this time Pratt's financial analysis revealed that closing CARO would yield the greatest increase in EBIT and ROS, Tom Hutton, Vice-President of Global Repair Services, instead recommended scaling down operations at CARO. This strategy, the "focused parts" strategy, was implemented in March 2008. Its positive effects were apparent by Summer 2008, when Pratt informed District 26 that they should be proud of the CARO improvements and that turn-times were very good. Nonetheless, because the scale-down option was creating a surplus of manpower at CARO, and because Pratt was worried about such a surplus given the economic downturn, the full strategy to focus CARO's operations was not implemented. Still, by February 2009, Hutton concluded that CARO had achieved "world class status operationally." Tr. at 856.

Notwithstanding these operational improvements, by December 2008 or January 2009, Hutton was again considering closing CARO.  By this time period, Hutton had become aware that UTC intended to make funds available for restructuring projects.  In addition, he had concluded that there was only enough work to support three turbine airfoil shops, not the four that Pratt had in operation at the time.  Analysis completed by Hutton's team by February 2009 indicated that closing CARO offered just over $20 million in recurring EBIT increases and an 8% increase in the ROS.  See Ex. 524 at 19. No extra value was assigned to choices that would keep work within the bargaining unit. Although closing DARO was also considered, that alternative was disfavored because DARO had a broader portfolio of products than CARO.  In February 2009, Hutton recommended closing CARO to Kallman.  In his consideration of the options and in reaching his decision to recommend the closure of CARO, Hutton did not take workforce preservation into account as a separate and important value.  At no time after this recommendation did Hutton's position change, nor did anyone at Pratt ever express disagreement to Hutton about the closure plan.

After this recommendation to close CARO was formulated by Hutton in early 2009, the closure strategy followed a path to implementation similar to the strategy to close Cheshire.  See supra, at 14-16.  Stated briefly, Kallman and then Hess, Pratt's President, came to agree with the CARO closure recommendation, as did Bhalla and Amato.  The court finds that neither Hess, Kallman, Bhalla, nor Amato considered workforce preservation as a separate and important value in reaching their decisions to support the closure plans.  The CARO closure plan was proposed to UTC at the same February 13, 2009 meeting at which the Cheshire plan was presented.  The UTC Board

-18-

approved funding restructuring projects, including the CARO closure plan, on March 10, 2009.  Pratt believed UTC informally gave its approval to announce the closure of CARO between June 21, 2009 and June 24, 2009, subject to "Pratt's ability to complete the transition . . . before the start of the 2010 labor negotiations."  See Ex. 40.  In weighing the closure plan and its alternatives, UTC did not assign any extra value to workforce preservation and did not pursue the goal of preserving CARO jobs in its decision-making.  Final UTC approval came by July 2009.

Up to and after the period at which closure of CARO was first recommended, numerous efforts were made to improve the performance at CARO.  In 2008, Pratt purchased ergonomic equipment and two automatic grip blast machines, and it sought to bring every machine in the facility up to current standards.  Pratt also continued to meet with District 26.  During the decision-making process, Pratt informed District 26 that it was looking to bring work into CARO.  In April 2009, in response to an inquiry by District 26, Warters indicated CARO had the potential to close.  See supra, at 16.

By letter dated July 21, 2009, and pursuant to Article 27 of the CBA, Pratt notified District 26 that it had been "evaluating opportunities to eliminate excess capacity within our overhaul and repair network," and that CARO was a "likely candidate for closure."  Ex. 73.  In a July 22, 2009 letter, District 26 exercised its right under Article 27 of the CBA to "meet and confer" regarding the decision to close the CARO plant.

D.    Meet and Confer Process

The parties met on seventeen occasions between July 24, 2009 and September

-19-

11, 2009.[11]  Although the 45-day meet and confer period was scheduled to end on September 6, 2009, Pratt agreed to extend the meet and confer process for one week, to September 13, 2009.  Early in the meet and confer process, Pratt informed District 26 that closing Cheshire and CARO and relocating the work performed at those facilities to ESA, CEC, TOS, DARO and JTT would result in $53.8 million of "annual recurring savings" ($33.6 million for Cheshire and $20.2 million for CARO).  Ex. 546, 547.  This forecast had fluctuated widely in 2009 based upon changes in the assumptions of Pratt's financial analysis.  Compare Exs. 546, 547 (estimating $33.6 million recurring savings for Cheshire and $20.2 million recurring savings for CARO on August 4, 2009) with Ex. 28 (estimating $43 million recurring savings for Cheshire and $12.7 million recurring savings for CARO as of February 13, 2009).

Additionally, when Pratt determined its plans to close Cheshire and CARO and move work to other facilities were worth $53.8 million, Pratt failed to account for the fact that Pratt would only realize 51% of any savings benefit that thereby accrued at two of its joint venture facilities (ESA and TOS) and 66% at its other joint venture facility (JTT).  Because those facilities operated as joint venture arrangements in which Pratt was the majority partner, 49% of earnings attributable to those facilities (33% for JTT) and claimed by Pratt to be its recurring savings, would in fact be earnings owned by the joint venture partners.  See Exs. 88, 89.  These savings clearly were not savings to Pratt.  As Warters described the arrangement in a May 8, 2008 email to other Pratt officials:

---

[11]  Meet and confer sessions attended by Pratt and District 26 officials were held on July 24, August 4, August 6, August 7, August 12, August 13, August 19, August 20, August 27, August 28, September 1, September 2, September 3, September 8, September 9, September 10, and September 11.

"sales/EBIT are consolidated, but the partnership fee washes out the real impact so we feel only our share despite at the end of the day despite [sic] what gets accounted."  Ex. 102.  The portion of the $53.8 million of recurring savings that would in fact be that of the joint venture partners is estimated to be $13 million, recurring.

Pratt justified its failure to reduce its $53.8 million calculation by its partners' shares on the basis that Pratt uses EBIT as its primary accounting standard, and any joint venture payments would be made "below" the EBIT line.  Pratt often uses EBIT in its analysis, but Pratt frequently assesses its business cases along non-EBIT lines, e.g., a particular plan's net present value as measured in cash.  See Tr. at 58; Ex. 65.

Although Pratt's internal business plan clearly shows the existence of joint venture payments being made after EBIT, see Exs. 88, 89, Pratt never clearly informed District 26 that the $53.8 million it was targeting included nearly $13 million of savings that were attributable to Pratt's joint venture partners.  No one told District 26 about the joint venture payments during meet and confer because "we were presenting EBIT data.  EBIT is just that, it is EBIT."  Tr. at 873-74 (Hutton).  District 26's McCarthy testified that the joint venture dividend payments were discussed, but that his impression was that the $53.8 million figure already took those payments into account.  The court finds that Pratt never made it clear to District 26 that Pratt would not receive the full $53.8 million benefit.[12]  See Tr. at 1159, 1167 (McCarthy).

At the beginning of the meet and confer process, Pratt's Warters informed

---

[12] This finding is further informed by the testimony of Neil Gladstein, District 26's C.F.A., that, to the extent he was involved in the meet and confer, he never was informed that the joint venture partners' shares had been factored into the $53.8 million figure.

District 26 that, in order to keep the work in Connecticut, District 26 would have to find just over $40 million of recurring savings.  This figure, which was roughly 20% less than the $53.8 million of recurring savings Pratt had identified within the final closure plans, was determined based upon Pratt's assignment of "extra value" to decisions that would keep work in Connecticut.  District 26 was also informed that Pratt was looking for recurring EBIT savings.  In addition, there was no amount of savings that District 26 could have offered for the duration of the CBA alone that would have led Pratt to abandon its closure plans.[13]

1.    Proposals Offered by Pratt and District 26

Numerous proposals for an alternative to the Cheshire/CARO closure plans were generated by Pratt and District 26, and then passed between the parties during the meet and confer period.  See Exs. 74, 75, 76, 79, 77, 80, 81, 82, and 567.  While it is unnecessary to describe the various iterations of each of these proposals, two features bear noting.  First, in all of the proposals Pratt made to District 26, at no time did they present a proposal that called for the reduction of wages of only the Cheshire and CARO employees; each of Pratt's proposals required contract modifications that would force bargaining unit members -- including collective bargaining unit members unaffiliated with the facilities slated for closure -- to agree to a wage reduction.  Second, at no time did Pratt offer or even consider any proposal that effectuated savings only through December 5, 2010, the duration of the CBA: each of Pratt's proposals required

---

[13] Kallman explicitly so testified.  Although Hess did not explicitly state that there was "no amount" of savings District 26 could successfully offer for a one year period, his testimony -- that not even a one-year offer worth $80 million would have been sufficient -- supports this finding.  See Tr. at 1147.

District 26 to produce significant savings through 2013.

a.    Pratt's Last, Best, and Final Offer

On September 11, 2009, Pratt offered District 26 its final proposal for keeping Cheshire and CARO open.  See Ex. 80.  Although the proposal contained numerous provisions, the bulk of the savings it generated were attributable to several critical items.  By its terms, the proposal called for the CBA to be extended through December 2, 2013.  It also required all bargaining unit employees -- even those not employed at Cheshire or CARO -- to adopt a wage reduction.  CARO, Cheshire, and EHRO employees would be subject to a 14.7% wage decrease to be phased in over two years; all other ConnOps bargaining unit employees would be subject to a 5.25% wage decrease, also to be phased in over two years.  The proposal also eliminated all General Wage Increases through 2013, and eliminated Sunday and holiday double-time payments across Connecticut.

Pratt believed this proposal offered a viable option largely because, in Pratt's estimation, the average compensation rates at Cheshire and CARO meant that the proposed wage reductions were feasible to implement.  District 26 believed that Pratt's proposal had "absolutely no chance of passing" and never submitted the proposal for a bargaining-unit-wide approval vote.[14]  Tr. at 668.

---

[14]  District 26's opinion was based largely on the fact that approving the proposal would require that 50% plus-one of all collective bargaining unit employees across Connecticut vote to accept its terms.  The bargaining unit has roughly 3700 members in Connecticut.  Because the proposal demanded wage concessions of 2800 people -- collective bargaining unit employees outside of Cheshire and CARO -- that were unaffected by the closure announcements, District 26 thought that it could not cultivate enough support for the proposal to pass such a vote.  Instead, District 26 urged Pratt to accept its concessions for the remainder of the CBA, and then enter full contract negotiations to discuss the terms of any potential agreement to maintain collective bargaining unit work beyond 2010.

b.      District 26's Last, Best, and Final Offer

On September 11, 2009, District 26 made two proposals to Pratt, one of which was its last, best, and final offer.  See Ex. 82.  The last, best, and final proposal included, inter alia, provisions to eliminate the general wage increase under the CBA throughout Connecticut, reductions in overtime throughout Connecticut, elimination of awards, reduction of DCI time (direct cost indirect time), implementation of the ACE performance improvement program, and elimination of double-time at Cheshire.  The proposal also called for a 10% wage reduction for Cheshire, CARO, and EHRO (subject to modification based upon performance reviews).  Finally, in order to account for problems related to volume loss, the proposal called for work to be moved from CEC to Cheshire, or from CEC to ESA and ESA to Cheshire.  In contrast with Pratt's last, best, and final offer, District 26's last, best, and final offer only proposed modifications to the CBA that would last for the CBA's term; in other words, it did not propose modification of the expiration date.

District 26 valued its proposal as producing $81.2 million in savings.  Pratt valued District 26's proposal as worth $25.8 million in savings.  Pratt attributed no value to the proposed shift in work, the overtime reduction, the DCI reduction, or the ACE implementation.  Furthermore, Pratt reduced the value of wage decreases because District 26 had not taken into account the fact that a workforce reduction was necessary given diminishing volume.  Pratt ultimately identified the availability of $25.8 million of savings offered by District 26 for 2010 if it was to forego the closure of Cheshire and CARO.  See Ex. 570.  District 26's $25.8 million, as valued by Pratt, was only available through December 5, 2010.

-24-

2.    State Involvement

At numerous points during the meet and confer period, both Pratt and District 26 consulted with the State of Connecticut as to whether the State might be able to provide assistance to help District 26 close the $53.8 million gap.  Warters advised Pratt officials that meeting with the State was an "appropriate and necessary step" in the process, largely because it was Pratt's view that it had been criticized by the Second Circuit in its decision in the 2000 litigation for not seeking out the State's assistance. See Ex. 52.   On August 10, 2009, Pratt representatives, including CFO Bhalla, had a teleconference with Lisa Moody, Governor Rell's Chief of Staff, Joan McDonald of the Department of Economic and Community Development, and Richard Nicholson of the Department of Revenue Services.  On August 21, August 31, and September 4, 2009, Pratt and UTC representatives again met with State of Connecticut officials, including McDonald and Nicholson, to discuss potential opportunities for State assistance. Moody participated in the August 21 meeting.

At the September 4, 2009 meeting, McDonald gave Pratt and UTC representatives a letter addressed to Pratt President David Hess outlining the State's proposal for assistance.[15]   The State of Connecticut valued its proposal at $20 million a year over five years.  However, when Bhalla evaluated the proposal, he valued Connecticut's offer at only $5 million of annual savings for a five-year period.  Ex. 68. The disparity in valuation is based on numerous factors.  First, while the State valued a "Job Retention Tax Credit" as worth $4 million per year, Pratt valued this incentive at

---

[15] Jim Parent, President of District Lodge 26, also had contact with the State and was informed of the State's proposal.

$2.5 million because workforce reductions were necessary given volume losses.[16] Second, the State valued its "Corporation Business Tax Credit" as worth $7 million each year, but Pratt did not assign any value to this proposal.  Pratt declined to extend any value because, while the State had previously capped the extent to which a corporation may receive a tax credit for research and development expenditures at 70% for any given year, in Pratt's accounting and financial statements, it continued to count the entire 100% of tax credit in EBIT.  In other words, even though Pratt only actually was allowed to use 70% of its corporate tax-credit in a given year, it claimed the entire 100% in its accounting, and therefore did not assign any value to the State's offer to lift the cap for Pratt.  Tr. at 1069.  Essentially, this proposal would only have a cash impact and not an effect on EBIT.  Lastly, while Connecticut valued "Engineering COE Assistance" at $10 million recurring, Pratt assigned zero value to the incentive, primarily because Pratt had not decided whether it would build a brand new engines building, which was what the funding was designated to support.

Despite these official Pratt valuations which it used in comparing the District 26/State offers to its forecasted, long-term savings under its plan to close Cheshire and CARO, Pratt believed that the State's offer did contain additional value for Pratt beyond the $5 million Pratt assigned to it.  Thomas Bowler, Head of Human Resources for UTC, wrote to James Miller, Vice President of Industrial Relations for UTC, on September 10, 2009, and stated: "I read your note to say that there are 'real' savings beyond the 5m but that they just can't be assigned to cheshire.  So maybe UTC or

---

[16] Reductions in the collective bargaining unit workforce on account of volume loss, as opposed to the closure of a facility, do not violate the CBA.  See CBA at Letter 22 § 2(B)(3).

broader Pratt would bebefit [sic] from those savings beyond the 5m.  I feel better if all there is for real savings is the 5m."  Miller replied and confirmed: "There are other savings in the Governor's offer."  Ex. 61.  Further, Miller wrote an additional email to Bowler and others on September 11, 2009, in which he discussed the "Corporation Business Tax Credit" component of the State's plan.  He stated: "there is the equivalent value of about $6-7M that would be legitimate to UTC's benefit (not Pratt CARO/Cheshire) with the removal of the 70% tax credit . . . ."  Ex. 62.  Indeed, there is every indication that the State's proposal contained more than $5 million in recurring value for Pratt, regardless of whether that value was specific to Cheshire or CARO. See Ex. 83 (internal Pratt valuation separating $5 million of "Cheshire/CARO Specific Value" from $17 million of "Other UTC Value").

After the September 4, 2009 offer was made by the State, there were additional interactions between Pratt, the State of Connecticut, and other interested politicians. On or about September 15, 2009, Gary Minor, the UTC head of State-government relations, had an additional conversation with Moody.  During that conversation, Moody instructed Minor that the State would be willing to provide an additional $10-12 million over five years, and that, if Pratt and District 26 were "close," Pratt should return to the State for additional talks.  Pratt never initiated a second round of discussions with the State.  Furthermore, on September 10, 2009, UTC's President, Louis Chenevert, was informed that Pratt was considering how important it was for him to participate in a call with "the senators;" Chenevert responded that "his [the Senator's] request is not to go ahead with Cheshire which I will not support.  We better wait before we set up the call with him."  Ex. 60.

3.      End of Meet and Confer

After the final proposals were exchanged on September 11, 2009, Pratt stated that it would review District 26's proposal and the State's offer and then get back in touch with District 26.  At this time, District 26 officials expected there to be further dialogue.  However, District 26 did not receive any valuation of its final proposal from Pratt.  District 26 did not hear from Pratt until September 21, 2009, when it received Pratt's official notification that it was going to proceed with its plan to close Cheshire and CARO because the closure plan would generate $53.8 million in "annual recurring, quantifiable savings."  Ex. 87.  District 26 filed this lawsuit on September 22, 2009.

## III.     DISCUSSION[17]

It is beyond dispute that a corporation has the authority to formulate its own business judgments; indeed, that authority is incorporated into the CBA between Pratt and District 26.  In Article 1, "Management Functions," the CBA states that, "the Company has and will retain the sole right and responsibility to direct the operations of the Company and in this connection to determine the number and location of its plants; the product to be manufactured; the types of work to be performed; the assignment of all work to employees or other persons . . . ."  CBA at Art. 1.  Elsewhere, Article 27 emphasizes that "[t]he final decision regarding closing a plant or transferring a business unit rests solely with the Company."  Id. at Art. 27.  It is therefore not District 26's role,

_____

[17] Although the court has provided most of its findings of fact in the preceding section, some of the court's findings of fact are made within this section for ease of discussion.

nor the role of this court, to stand in judgment of Pratt's business decisions.[18]

Nonetheless, while it is undeniable that Pratt retains management control over its business decisions, the CBA limits Pratt's management discretion.  First, Letter 22 provides that Pratt will employ bargaining unit members at its facilities in East Hartford, Middletown, and Cheshire throughout the duration of the CBA.  CBA at Letter 22 § 1. Thus, Pratt must at least maintain roughly 100-150 employees at these plants through December 5, 2010.[19]  Tr. at 254.  Second, Article 27 requires Pratt to give District 26 six-months notice of its closure plans and to engage in meet and confer sessions if District 26 so requests.  CBA at Art. 27.  Finally, Letter 22 requires that Pratt make "every reasonable effort" to preserve the work presently and normally manufactured by collective bargaining unit employees, as further defined by subsequent sections of Letter 22.  Id. at Letter 22 § 2.  Beyond these specific provisions, the CBA also contains an implied covenant of good faith and fair dealing that requires the parties to act in good faith in its execution of their promises in the CBA.  See Elm Haven Const. Ltd. P'ship v. Neri Const. LLC, 376 F.3d 96, 102 (2d Cir. 2004) ("Under Connecticut law, '[e]very contract carries an implied covenant of good faith and fair dealing requiring that neither party do anything that will injure the right of the other to receive the benefits of

---

[18] Furthermore, even if the court were to assess the virtue of Pratt's decision to close Cheshire and CARO, it would appear that the restructuring plan makes business sense.  Pratt demonstrated at trial that, in all likelihood, closing Cheshire and CARO and transferring the work elsewhere will generate recurring savings that will, at some point in the future, exceed the initial investment such restructuring requires.  Even District 26 officials testified that it was persuaded that Pratt had a "real business problem." Tr. at 497.  It also appears from this record that closing these operations in 2007, before the CBA was entered into, might also have made sense.

[19] This clause of Letter 22 is not at issue because the restructuring plans call for the maintenance of at least one line at Cheshire through the duration of the CBA.  CARO is located in East Hartford, at which location Pratt employs bargaining unit employees in other work.

the agreement.'") (citation omitted); see also 2 RESTATEMENT (SECOND) OF CONTRACTS §

205 (1979).  Not only does the court find that these provisions of the CBA limit Pratt's

management discretion: there is also every indication that Pratt understood these

obligations and viewed them as actual limitations on its ability to transfer work out of

Cheshire and CARO and close those facilities.

At no time has Pratt challenged the enforceability of the CBA or these provisions,

and the court concludes that they are sufficiently definite to constitute enforceable

promises.  Therefore, although it would be inappropriate to second-guess Pratt's

business judgment, it is nonetheless necessary to determine whether, as District 26

contends, Pratt failed to uphold its contractual obligations to District 26 under the CBA,

especially its obligations under Letter 22, in exercising that judgment.  As the Second

Circuit explained in the 2000 litigation between these parties:

> Although on its face this review of Pratt's behavior seems to
> involve the federal courts in second-guessing decisions that are
> uniquely within an employer's expertise, like work transfers, in fact
> the task is a familiar one to us.  Courts are frequently called upon
> to determine whether decisions by private actors, including
> businesses, constituted their "best efforts" or were "reasonable" or
> undertaken "in good faith."

Aeronautical Indus. Dist. Lodge 91 of the Int'l Ass'n of Machinists and Aerospace

Workers, AFL-CIO  v. United Technologies Corp., Pratt & Whitney, 230 F.3d 569, 578

(2d Cir. 2000) ("District 91").

Keeping in mind Pratt's management authority and Letter 22's limitations upon

that authority, the court is tasked with addressing three issues.  First, the court must

determine if, as District 26 contends, Pratt violated the terms of Letter 22 of the CBA.

Specifically, District 26 argues that Pratt breached the "every reasonable effort"

provision of Letter 22, including its requirements that Pratt assign "extra value" in its decision-making and that Pratt meet and confer and consider proposals in good faith. Second, the court must decide if Pratt violated the CBA's implied covenant of good faith and fair dealing. Finally, if Pratt has in fact breached the CBA in either of these ways, the court must determine if that breach warrants injunctive relief. The court will address each of these issues in turn.

A.    Breach of Letter 22

District 26 first argues that Pratt's actions in developing and implementing the plans to close Cheshire and CARO violated the terms of Letter 22. Specifically, District 26 contends that Pratt did not "make every reasonable effort to preserve work presently and normally manufactured by employees covered by Article 2 of this Agreement."[20] Inclusive of this obligation to make "every reasonable effort" is the requirement that Pratt assign "extra value" in its decision-making to choices that will keep work within the collective bargaining unit, which District 26 claims Pratt also violated. District 26 asserts that there are numerous ways in which Pratt breached these provisions of Letter 22. While the court will address each of these arguments separately, the court's ultimate assessment of whether Pratt has breached its duty to make "every reasonable effort" to preserve bargaining unit work will be based upon Pratt's overall conduct as to its "every reasonable effort" obligation.

---

[20]   The parties have stipulated that the work performed at Cheshire and CARO qualifies as work "presently and normally manufactured by employees covered by Article 2 of this agreement." See Amended Stipulations at ¶ 17.

-31-

1.     Interpretation of Letter 22

Before addressing the specific allegations District 26 makes with regard to the breach of Letter 22, it is first necessary to address the interpretation of this contractual provision.  In interpreting the terms of a collective bargaining agreement, "traditional rules of contract interpretation apply as long as they are consistent with federal labor policies."  District 91, 230 F.3d at 576 (2d Cir. 2000).  "When provisions in the agreement are unambiguous, they must be given effect as written."  Id.  Additionally, courts "should attempt to read CBAs in such a way that no language is rendered superfluous."  Id.; see also RESTATEMENT (SECOND) OF CONTRACTS § 203(a) (1979) (providing that "an interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect").

In addition, courts may look to extrinsic factors -- including bargaining history, past practices, and other provisions in the CBA -- "[o]nly when provisions are ambiguous."  District 91, 230 F.3d at 576.  A "court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity . . . .  Moreover, the mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous."  Afkari-Ahmadi v. Fotovat-Ahmadi, 294 Conn. 384, 390-91 (2009) (citations omitted).

Even though different interpretations of some provisions of Letter 22 have been advanced by the parties, the court concludes that the terms of Letter 22 are clear and unambiguous.  While a prior version of Letter 22 was found by the Second Circuit to be "not unambiguous on its face" in 2000, the Letter 22 at issue in this case contains its

-32-

own definition of "every reasonable effort."[21]  District Lodge 91, 230 F.3d at 576-77.

The Letter 22 at issue in this case states that:

> '[E]very reasonable effort' means pursuing actively and in good
> faith the goal of preserving the work presently and normally
> manufactured by employees covered by Article 2, while giving
> reasonable consideration to the Company's own interests,
> including the profitability of its operations.  The Company will
> assign extra value in its decision-making to choices that preserve
> such work in the bargaining unit.

CBA, Letter 22 at § 2(B)(4).  Further, Letter 22 continues to state that, as part of the

meet and confer process, "the Company will describe the efforts made to comply with

this Letter and will provide the Union the opportunity to propose other reasonable

efforts, including modifications to the collective bargaining agreement, which the

Company will consider in good faith."  Id.  Finally, Letter 22 makes clear that, "[i]n no

event will 'every reasonable effort' require the Company to make a capital investment,

increase the size of the workforce, or require lower profits."  Id.  With this interpretive

lens in mind, the court now turns to whether Pratt breached Letter 22.

> 2.    Pursuing Actively and in Good Faith the Goal of Preserving
>        Cheshire and CARO Work

District 26 asserts numerous allegations that it contends demonstrate that Pratt

failed to "pursue actively and in good faith the goal of preserving" the Cheshire and

CARO work:

---

[21] The Second Circuit's conclusion in 2000 was based largely on the fact that the "every effort"
clause "is ambiguous because it refers to work 'manufactured' by members of the bargaining unit, thereby
raising the possibility that the parties had in mind only the manufacturing work performed by union
workers, not the repair work at issue here."  District 91, 230 F.3d at 577. However, as noted earlier, supra,
at 31 n.20, in this case,  the parties have stipulated that the "work performed at both CARO and Cheshire
constitutes 'work presently and normally manufactured by employees covered by Article 2' of the
Agreement."  Amended Stipulations at ¶ 17.

(1) Pratt insisted, during the meet and confer, only recurring savings through 2013 would preserve the bargaining unit work, and gave no consideration to any alternative plans that created savings through the life of the CBA;

(2) Pratt overvalued its own restructuring plan in claiming it was worth $53.8 million in recurring savings both because it did not factor into its analysis that Pratt would only benefit from a portion of the restructuring plan's predicted savings attributable to joint venture facilities (51% for ESA and TOS, 66% for JTT) and because Pratt's projected savings were uncertain projections;

(3) in its interactions with the State of Connecticut during the meet and confer, Pratt did not approach the State in good faith, and undervalued the State's proposal in determining that the incentives the State offered were worth $5 million annually for five years, not $20 million, largely on the basis that they did not impact EBIT;

(4) Pratt failed to pursue the "*goal* of preserving" bargaining unit work by its attempt to improve the efficiency of CARO and Cheshire and instead implemented those improvements to enhance profitability, not to accomplish the goal of preserving the work; and

(5) Pratt did not make "every reasonable effort" to preserve the bargaining unit work because it did not notify District 26 of its closure plans until July 21, 2009, thus leaving District 26 only 45 days to develop a proposal with significant savings and denying District 26 additional time during which it might have been able to find such savings.

As noted earlier, the court will ultimately assess Pratt's overall conduct to determine if it made "every reasonable effort" to preserve bargaining unit work.  Nonetheless, the court will address each of District 26's arguments separately.

a.     Pratt's Decision to Only Consider Alternatives to Closure That Provided EBIT Savings Through 2013

District 26 first argues that Pratt did not make "every reasonable effort" to preserve work within the bargaining unit because it would only consider alternatives to

-34-

closure that provided for recurring, EBIT savings through at least 2013.  District 26

contends that Pratt's rigid adherence to its position that any alternative proposals put

forth by District 26 or the State satisfy these terms constitutes a breach of Pratt's

obligation to pursue "actively and in good faith" the goal of preserving the work at

Cheshire and CARO.

      i.    <u>Requiring District 26 to Provide Savings for Four-Year Period.</u>  First,

District 26 argues that, by demanding during the meet and confer period that District 26

provide recurring savings of nearly $53.8 million through at least 2013 in order to avoid

closure, and not merely savings for the duration of the collective bargaining agreement,

Pratt breached its "every reasonable effort" obligations.  Pratt responds by noting that

Letter 22 specifically states that Pratt must pursue the goal of preserving work "while

giving reasonable consideration to the Company's own interests, including the

profitability of its operations."  CBA at Letter 22 § 2(B)(4).  Given this language, Pratt

argues, it was entirely reasonable for it to seek savings beyond the termination of the

CBA, considering that its restructuring plans generated savings that were recurring.

Pratt bolsters this position with credible testimony about Pratt's frequent use of, and

need for, "long-term planning."[22]

      The parties' disagreement over whether Pratt's demand for savings through

2013 satisfies its "every reasonable effort" obligations under Letter 22 is attributable to

---

[22] <u>See</u> <u>supra</u>, at 13 n.7.  Kallman explained that a one-year solution would not solve Pratt's problems, because they "were bidding on business currently that's going to 5, 10, 15, 20 years in some cases, so a one-year number did not help us."  Tr. at 618.  While Pratt's customer contracts are long-term, Pratt's labor contracts typically are not.  Specifically, Pratt and District 26 have historically entered into collective bargaining agreements that last for three years.  The recent collective bargaining arrangements have been renegotiated in 1998, 2001, 2004, and 2007.

the parties' different interpretations of the definition of "every reasonable effort" that Letter 22 provides.  The portion of that definition that is in dispute as to this temporal issue states: "'[E]very reasonable effort' means pursuing actively and in good faith the goal of preserving the work presently and normally manufactured by employees covered by Article 2, while giving reasonable consideration to the Company's own interests, including the profitability of its operations."  CBA at Letter 22 § 2(B)(4). District 26 contends that, because the clause describing Pratt's obligation to pursue "the goal of preserving work" is coterminous with the CBA, so too is the following clause allowing Pratt to consider its interests.  In other words, District 26 argues that Pratt may not consider its interests beyond December 5, 2010.  Pratt contends that Letter 22's language relating to the "Company's own interests" is meant to apply to long-term interests that extend beyond the term of the CBA.  Pratt therefore asserts that, in evaluating its restructuring plans, it may require District 26 to provide savings well past the termination of the CBA in order to preserve work in the bargaining unit.  For the reasons that follow, the court concludes that neither District 26 nor Pratt offers the proper interpretation of Letter 22 § 2(B)(4).

District 26 takes its position too far in asserting that, under Letter 22, Pratt may not even *consider* its own interests beyond the life of the present CBA, and that Pratt's final proposal was therefore "unreasonable."  See Pl.'s Proposed Findings of Fact and Conclusions of Law ("Pl.'s Ppd. Fdgs.") (Doc. No. 57) at 79.  The court agrees with Pratt that there "is nothing unreasonable or in bad faith about Pratt's proposal to amend the CBA to extend its duration and ensure that any resulting savings would be recurring for

at least through December 2013."[23]  Def.'s Proposed Findings of Fact and Conclusions of Law ("Def.'s Ppd. Fdgs.") (Doc. No. 58) at 41.  Letter 22 specifically states that alternative proposals may include "modifications to the collective bargaining agreement."  CBA at Letter 22 § 2(B)(4).  While District 26's President (Parent) testified that his understanding of this provision was that it allowed parties to propose modification only to the *current* CBA that was "in effect until next year*,*" thereby implying that a modification to extend the CBA would create a "new" CBA, the court disagrees.[24]  See Tr. at 402-405.  By its proposal, Pratt did not seek the negotiation of a new CBA.  Instead, Pratt sought to modify Article 30 of the *current* CBA to extend the *current* CBA through 2013.

Article 30 itself expressly provides that the duration of the CBA may be changed through mutual agreement.  See CBA at Art. 30 § 3 (". . . this contract shall terminate as of its expiration date unless specifically extended by written agreement . . ."); id. at Art. 30 § 1 ("This agreement shall be in full force and effect until midnight, December 5, 2010, and for additional periods of one (1) year thereafter unless either party hereto shall give written notice of its intent to terminate the Agreement or modify any portion or any of the terms hereof . . . .").  Letter 22 clearly contemplates that the parties ought to be able to propose a modification to the term of the CBA such as the one Pratt

---

[23] As is addressed below, however, the fact that Pratt's last, best, and final offer may constitute a *single* reasonable effort to preserve work does not mean that Pratt can be said to have satisfied its duty to make "every reasonable effort."

[24] Parent also stated: "The language in 22 is only in effect until the expiration of the collective bargaining agreement. When it talks about modification, it talks about the modification of the particular collective bargaining agreement.  Who knows if letter 22 will be in existence in the following collective bargaining agreement."  Tr. at 403.  The court notes, however, that if the 2007 CBA is extended for a particular duration in the manner Pratt proposed, Letter 22 (a part of that CBA) would necessarily be extended for that duration as well.

proposed.  Therefore, Pratt's last, best, and final proposal cannot be deemed "unreasonable" solely on the basis that it suggested District 26 extend the term of the current CBA in order to keep work at Cheshire and CARO.[25]

Nonetheless, while the court does not believe Letter 22 prohibits Pratt from even *considering* its interests beyond the expiration of the CBA, neither does the court agree with Pratt's interpretation of Letter 22 that allows Pratt to consider its own interests in making "every reasonable effort" without boundary.  Pratt's ability to consider its long-term interests is tempered by Letter 22's language, which states that Pratt may give "*reasonable consideration*" to its own interests.  Letter 22 § 2(B)(4) (emphasis added).  To the extent that Pratt advances an interpretation of Letter 22 that would allow it to consider its long-term interests without any limit, that interpretation is unsupported by the language.  Pratt's interpretation would do nothing less than render Letter 22's workplace promises illusory.  If Pratt could consider its long-term interests without any

---

[25] Nor can the proposal be deemed unreasonable because it was destined to fail, as District 26 argues.  District 26 contends Pratt knew or should have known that its proposal could not possibly have been accepted by 50% plus one of the District 26 membership.  Because the employees affected by the restructuring plans constituted only 22% of the bargaining unit membership, District 26 argues Pratt should have known that there was no reasonable possibility that its proposal calling for Connecticut-wide cuts could have garnered anywhere close to the 1000 non-Cheshire/CARO votes that were required for passage, even if all Cheshire/CARO employees supported the proposal.  The court disagrees.

In District 26's own final proposal, it called for cuts to be made across the entire collective bargaining unit.  For instance, District 26 called for the cancellation of the scheduled 3.5% wage increase.  See Ex. 82 at Item 13.  District 26 also called for EHRO members unaffected by the restructuring to take a 10% wage cut.  See id. at Item 7.  Indeed, District 26 had suggested these measures on September 10, 2009.  See Ex. 78.  Given that District 26 had itself included items that affected the entire collective bargaining unit in its proposals, it would not be unreasonable for the Pratt to suggest similar measures in a counter-proposal.

District 26 further contends that its own proposals would themselves have barely passed, and that Pratt should therefore have known its last, best, and final offer was unreasonable.  However, in light of the considerable testimony showing that District 26 was in the best position to evaluate the probability of a proposal passing a membership vote, the court concludes that Pratt could not have as keen a sense of the likely voting outcomes.  Therefore, the court finds that Pratt's last, best, and final offer was not unreasonable based on District 26's claim that it had no chance of passing.

regard for its short-term, Letter 22 obligations, Pratt could circumvent Letter 22's limitations on its authority to transfer bargaining unit work merely by formulating a business case that promised recurring savings far into the future, and demanding that District 26 find savings for an equivalently long duration.  Indeed, at the time Pratt signed the CBA in 2007, it had already known that transferring work out of CARO and closing that facility would have generated greater long-term savings than maintaining CARO operations.  See Ex. 501.  Under Pratt's interpretation of Letter 22, it could therefore have begun the closure process for CARO immediately upon signing the CBA, so long as District 26 was unable to find the same long-term savings that Pratt's own restructuring plan forecasted.  Pratt not only knew of Letter 22's significance to District 26 when it entered into the CBA; it also viewed Letter 22 as designed to create real limits upon Pratt's ability to transfer work.  The court concludes that Letter 22 does not permit the kind of limitless consideration of long-term interests that Pratt believes it allows, lest those intentions of the parties be subverted.

Section 2(B)(4) of Letter 22, properly interpreted, allows Pratt to give *reasonable consideration* to its interests, including long-term ones, as it attempts to "pursue actively and in good faith the goal of preserving" bargaining unit work.  Therefore, Pratt need not ignore its long-term interests as District 26 contends, nor can it satisfy Letter 22 by considering long-term interests at the expense of pursuing "*actively and in good faith*" the goal of preserving work within the bargaining unit.  CBA at Letter 22 § 2(B)(4) (emphasis added).  In light of this finding, the question before the court is whether Pratt's insistence that District 26 offer savings through at least 2013 in its proposed alternatives to closure constituted a "reasonable consideration" of its long-term

interests, or, instead, an unreasonable consideration of those interests.  Framed within

the broader language of Letter 22 § 2(B)(4), the court must inquire into whether,

notwithstanding the fact that Pratt's last, best, and final offer constituted one reasonable

effort to preserve bargaining unit work, Pratt can be said to have made "every

reasonable effort" by only considering alternative proposals that produced savings

through a long-term time period it chose to focus upon.  Id. (emphasis added).

The court concludes that Pratt's consideration of its long-term interests becomes

unreasonable at the point where Pratt only considers alternative proposals that strictly

adhere to the long-term benchmarks Pratt hopes to achieve, without any regard for

Pratt's short-term contractual obligations.  In other words, it was not unreasonable for

Pratt to design a proposal that provided for recurring savings beyond the scheduled

expiration of the CBA.  However, Pratt cannot "pursue actively and in good faith the

goal of preserving the work" by *only* considering proposals that provide for such

recurring savings.  As Pratt itself states in its Proposed Findings of Fact and

Conclusions of Law, "if [a particular measure] was a reasonable way of preserving the

work, Pratt had a duty to propose it."  Def.'s Ppd. Fdgs. at 43 n.16.  While Pratt goes so

far as to say that it had a duty to *propose* any reasonable way of preserving the work,

the court need only conclude that Pratt had the duty to *consider* any reasonable way of

preserving the work.  As the record indicates, Pratt never even inquired into whether it

would be feasible to implement its restructuring plans after the expiration of the CBA.

In the court's view, were Pratt intent on fulfilling its Letter 22 obligation to pursue

the goal of preserving the work, it would have investigated whether there was a way to

at least preserve the work for the remaining fifteen (15) months of the CBA.

Specifically, Pratt was obligated by Letter 22 to at least consider whether it would be feasible to pursue the goal of preserving bargaining unit work through 2010 by, for example, implementing its long-term restructuring plan after the expiration of the CBA, and inquire as to what cost would be associated with that delay.

No evidence was offered that shows Pratt ever undertook this endeavor.  With respect to the Cheshire plans, from the very first instance that Mayes suggested the closure of Cheshire in July 2008, he recommended a plan for closure in 2010.  See Ex. 9 at 14.  Throughout all of the various iterations of those closure plans, and through the meet and confer process, Pratt never evaluated the business case for delaying implementation of the restructuring plan for Cheshire until after the expiration of the CBA.  See Exs. 9-12, 15, 28, 550.  With respect to CARO, Hutton did determine in 2007 that, even though closure during the lifetime of the CBA would generate the greatest EBIT value, he would seek to instead focus CARO's operations in order to preserve the collective bargaining work.  However, despite accomplishing many of the goals of his "focused parts" strategy, Hutton nonetheless recommended closure in early 2009.  Although alternatives to closure were considered, at no time did Hutton (or anyone else at Pratt) evaluate the prospect of delaying its 2009 restructuring plan for CARO until after the expiration of the CBA in 2010.

Moreover, as Pratt prepared to implement the two restructuring plans, it firmly held the view that it was critical that the work be substantially transitioned out of Cheshire and CARO by December 2010.  See Ex. 32 (May 13, 2009 email from Warters to Amato stating that Jim Miller of UTC declared: "If the Cheshire employees aren't gone by September (2010) at the latest, we'll have a problem.  They'll poison the

-41-

rest of the well"); Ex. 40 (June 24, 2009 email among UTC and Pratt officials stating that "Pratt believes it was given the conditional approval to announce its intent to close both Cheshire and CARO . . . conditioned upon Pratt's ability to to [sic] complete the transition of the facility . . . before the start of the 2010 labor negotiations"); Ex. 41 (June 25, 2009 email from Kallman to Hutton stating Pratt has "received more feedback from downtown [UTC]" and "I will need to show them how we will manage these projects and a timeline that gets them complete before 12/2010"); Ex. 50 (August 3, 2009 email from Puglielli of Pratt to Pratt's CFO, Bhalla, in which Puglielli states "[t]he phase out begins Jan 2010 . . . the goal is to have all final shipments before contract vote"); Ex. 35 at 9 (June 2, 2009 "IR Risk Mitigation" presentation, showing all transfers completed before "Contract X" in December of 2010). Finally, with respect to Pratt's position during meet and confer, it is clear that there was no amount of savings that the State and District 26 could have offered for the then-remaining fifteen-month duration of the CBA that would have changed Pratt's decision.

Taking all of this together, the court concludes that at no point between the first formulations of the restructuring plans at issue in this case to the end of the meet and confer process did Pratt ever genuinely consider the possibility of waiting until after the CBA to implement its program. Savings for the duration of the CBA were never going to satisfy Pratt's desire for long-term savings, and Pratt never investigated whether its desire for long-term savings could be reconciled with its contractual obligations to attempt to preserve work through December 5, 2010.

To be clear, the court does not suggest that Pratt was in any way required to accept a loss of profits or sacrifice its long-term business interests. However, Pratt was

required to *pursue* the goal of keeping work at Cheshire and CARO through 2010.  If Pratt had evaluated delaying its closure plans until after December 5, 2010, it may well have concluded reasonably that it would be unable to do so.  Because Pratt never investigated this alternative, the record is devoid of evidence that would show it would have been unable to do so.  Nonetheless, Letter 22 required, at a minimum, that Pratt at least pursue that goal "actively and in good faith."  CBA at Letter 22 § 2(B)(4).  That Pratt never investigated whether its long-term plans might be implemented after the termination of the CBA -- thus keeping the work at Cheshire and CARO through December 5, 2010 -- demonstrates that it failed to do so.

Although the court concludes that Pratt's error lay not in failing to *find* a solution to maintain the workforce, but instead in failing to actively *pursue* that goal, the court will briefly describe the evidence on the record that suggests that, had Pratt actually actively pursued the goal of preserving work in good faith, there may have been a viable outcome that kept the bargaining work at Cheshire and CARO through 2010.[26]  It appears that Pratt may have saved more money during the life of the collective bargaining agreement had it accepted District 26's 15-month proposal than it will save by moving the work to the other locations during the life of the contract.[27]  Indeed, Pratt's Warters testified that, for the life of the collective bargaining agreement, District

---

[26]  This court is neither an accountant nor a financial analyst or business planner.  The following is offered by way of illustration to merely highlight the possibility that postponing its closure plans for less than one year would not necessarily have negatively impacted on Pratt's interests.  Even if at the end of a proper analysis it clearly would have, the court's point is only that Pratt should have done that analysis under the circumstances in this case.

[27]  This conclusion is of course without regard to factors Pratt never analyzed.  <u>See infra</u>, 45 at n.29.

-43-

26's proposal would have given Pratt "hard savings" in excess of any savings that Pratt would achieve during that time (15 months) if it executed the closure plans.  Tr. at 990. Warters stated, however, that, "[i]t would not have been reasonable for us to accept a very limited term savings to forgo the possibility of the opportunity for $53.8 million for a very long time."  Id. at 991.  When District 26's counsel then suggested that Pratt could have accepted District 26's proposal and executed the restructuring plan in January of 2011, thus avoiding forgoing the recurring savings, Warters replied that such a plan "begs much uncertainty into the process."  Id. at 992.  While the court agrees that there are numerous factors that may have made such a delay in the restructuring plans unfeasible or unacceptably uncertain, the court nonetheless concludes that Letter 22 required that Pratt at least make an effort to analyze such an alternative.  Indeed, under a plan to begin restructuring after implementing District 26's 15-month proposal, Pratt may not have had to depart from its long-term plan at all.

The court's assessment that a good faith pursuit of the goal of work preservation may have been successful is further supported by testimony regarding the net present value of the restructuring plans.  Bhalla testified that the net present value of the cash savings forecasted to result from executing the restructuring plans in 2010 was $106 million over a period of nine years.  Tr. at 1086.  He then testified that delaying the plan one year would yield "roughly around the same" [amount of $106 million of NPV].  Id.  If considering District 26's proposal in good faith, Pratt should have at least analyzed the

NPV of year nine (i.e., 2018) versus the Union's concessions in 2010.[28]  The court acknowledges that the conclusion of this analysis ignores certain factors that were never investigated.[29]  Nonetheless, in evaluating whether Pratt "pursued actively and in good faith" the goal of preserving work, the court finds it striking that no one from Pratt ever *evaluated* this scenario, or the assumptions it involved, to determine if there was a way that work could be preserved through the duration of the CBA while still achieving the benefits of its closure plans beginning in 2011.

It does occur to the court that a significant factor, which may have influenced whether restructuring after December 5, 2010, would have been feasible, was the risk of strike.  In exchange for Letter 22, District 26 agreed to Article 24 of the CBA, which

---

[28]  There is no evidence in the record as to whether the State would have offered incentives for a one-year term because Pratt never investigated this alternative.  However, even assuming there would be no contribution from the State for a one-year period, District 26's concessions were valued by Pratt at $21.9 million in cash terms ($26.9 million less $5 million).  Pratt valued its closure plan as worth $26.2 million in cash in 2017, the final year of the forecast.  Ex. 65 at 14.

Although Pratt claimed that Exhibit 65 was inaccurately drafted and therefore is unreliable, the information within Exhibit 65 that the court here references is not affected by the errors in Exhibit 65 claimed by Pratt.  Pratt asserts that Exhibit 65 is incorrect because "it wrongly assumes or wrongly incorporates a union proposal for eight years," whereas District 26's proposal only applied to 2010.  Tr. at 1055.  Nonetheless, Pratt's valuation of District 26's proposal for 2010 is not affected by this error.

[29]  For example, the State's offer was a five-year proposal, so in analyzing a delayed-implementation strategy one would need to assess whether there would be any contribution from the State.  Further, if there was a risk of strike, the likelihood of that event and its impact on Pratt's operations and profits would have had to have been assessed.  Pratt had experience in Connecticut with strikes and, at a minimum, that historic information could have been reviewed to estimate the risk and costs.

However, Pratt's witness also suggested that an additional factor that impedes a delayed-implementation strategy is the fact that the long-term analysis in Exhibit 65 cannot be relied on to consider the financial impact of delaying the plan to keep the work in Connecticut until December 2010.  Bhalla testified on redirect that the savings projections within Exhibit 65 do not take into account the fact that market conditions might change between the time Pratt originally sought to implement the closure plan (early 2010), and when Pratt would in fact implement the plan if it waited until after the CBA expired (late 2010).  See Tr. at 1102-1104.  The court concludes that a potential change in market conditions does not constitute so strong a source of uncertainty as to make failure to consider delaying the implementation of the restructuring plan for one year reasonable.  It cannot be Pratt's position that its restructuring plan will generate "annual, recurring, quantifiable" savings through 2013 and demand that District 26 find comparable long-term savings, and then in good faith claim that the fluctuating nature of those projections renders delaying implementation of that same plan by less than one year to be not reasonable.  Id.

-45-

Article provides that District 26 "will not call or sanction any strike, sympathy strike, sitdown, slowdown, other concerted stoppage of work, or picketing of the Company's plant by employees of the Company during the period of this Agreement."  CBA at Art. 24 § 1.  Were Pratt to delay implementation of its restructuring plan until after the expiration of the CBA, there would be a risk that a strike would occur, thereby driving operations at Cheshire and CARO to a halt and making it impossible for Pratt to complete the work normally done at Cheshire and CARO until after contract negotiations reached an impasse and the transition to ESA, CEC, TOS, and JTT was complete.  While this seems a likely concern to Pratt officials, they testified that they were not seeking to avoid a strike by scheduling the transfer of work before the expiration of the CBA.[30]  See, e.g., Tr. at 545, 995.

To the extent that Pratt's decision to implement its restructuring plans before the expiration of the CBA was in fact driven by a desire to avoid a strike, the record offers no evidence whatsoever that Pratt ever sought to investigate the potential likelihood, costs, or risks of a strike occurring.  In light of the fact that strikes had previously occurred within this bargaining unit, Pratt was in a position to at least make some assessment of the seriousness of a strike risk and its likely consequences.[31]  No such assessment was made by Pratt officials.  To the extent that Pratt's counsel offered such

---

[30] Pratt's counsel at oral argument asserted that consideration of a strike did not enter into Pratt's decision to go forward with its restructuring plans -- which the court agrees with.  However, counsel then added it did impact on the "execution," presumably referring to the timing of the plans' implementation. Transcript of Oral Argument ("Tr. of Oral Arg.") at 57.

[31] While a strike could be costly and disruptive, it cannot be said that avoidance of one is priceless.  In the past, Pratt apparently accepted the consequences of a strike in the face of demands by the Union that Pratt was unwilling to accept.  See Tr. at 297.

an evaluation, they represented to the court that "the risk of a strike . . . seems

remote."[32]   Def.'s Ppd. Fdgs. at 37.   Ultimately then, regardless of whether Pratt (a)

formulated its plan to close Cheshire and CARO before the expiration of the CBA

without consideration of the risk of a strike, thereby offering no explanation as to why

implementing those plans in 2011 would not be a reasonable way of preserving

bargaining unit work, especially with District 26's proposed savings, or (b) formulated its

plan to close Cheshire and CARO before the expiration of the CBA precisely in order to

avoid a strike, but at the same time never investigated the likelihood of such a strike or

the potential consequences such a strike would trigger, Pratt failed to pursue "actively

and in good faith" the goal of preserving the collective bargaining unit work.[33]

In finding that Pratt's failure to consider the possibility of implementing its

---

[32] Specifically, Pratt stated:

> [T]he evidence at trial indicates that even if the entire represented workforce at
> Cheshire and CARO were still working in December 2010, and therefore entitled
> to vote, the risk of a strike being produced by adverse votes from those
> members seems remote.  Given the "two-thirds plus one" requirement for a
> strike vote, the votes of Cheshire and CARO members, representing just 27%
> of the total Union membership, should not present a real additional threat of a
> strike risk.  This is especially true given that the Union emphasized throughout
> the trial that the employees in Middletown and East Hartford would not be
> inclined to vote to save the jobs of their brethren in Cheshire and CARO for
> anything more than very modest (and short term) wage concessions.

Def.'s Ppd. Fdgs. at 37.

[33] Pratt cites 29 U.S.C. §§ 158(a)(5) and 158(d) as obstacles to executing the restructuring plan
after December 5, 2010.  While the court agrees that Pratt has statutory obligations that exist independent
of obligations under the CBA, nothing in the record supports a finding that this statute would make
transferring work after the CBA expires a necessarily unreasonable option.  Section 158(d) states that
"such obligation does not compel either party to agree to a proposal or require the making of a
concession."  29 U.S.C. § 158(d).  Furthermore, in light of the fact that Pratt can fulfill its statutory
"obligation to bargain collectively" during the term of the current CBA, nothing in the record indicates that
Pratt's obligations would extend beyond December 5, 2010.  See CBA at Art. 30; 29 U.S.C. § 158(d)(4).
Moreover, just as Pratt made no real inquiry into the costs associated with a strike, neither does the record
indicate Pratt considered the risks associated with the need to fulfill its bargaining in good faith obligations.

restructuring plans after the expiration of the CBA constitutes one way that Pratt did not make "every reasonable effort," the court does not mean to suggest that Pratt was obligated to pursue an infinite number of alternatives.  This court will not attempt to enumerate a list of those endeavors that Letter 22 required Pratt to undertake.  See District Lodge 91, 230 F.3d at 579 ("We will not attempt to delineate with precision what actions would fulfill the Company's obligation to make all reasonable efforts to preserve bargaining unit work.").  The court merely finds that, while formulating a plan to close the Cheshire and CARO facilities to achieve enhanced recurring earnings, Pratt's "every reasonable effort" promise at a minimum required evaluating whether such a plan could be implemented after the expiration of the CBA -- thus preserving bargaining unit work. In so rigidly insisting upon "recurring savings" immediately, Pratt did not pursue "actively and in good faith the goal of preserving" bargaining unit work while giving "reasonable consideration to [its] own interests."  Instead, Pratt pursued its long-term interests, and only gave consideration to the goal of preserving work to the extent that this goal overlapped with its own.[34]  As such, Pratt breached the terms of Letter 22.

      ii.    <u>Decision to Only Consider Savings that Impacted EBIT.</u>  District 26 also argues that Pratt acted unreasonably in declining to assign any value to non-EBIT savings in its final analysis of the closure plan and its alternatives.  This issue

---

[34] For District 26's part, it stated that its goal was "to be able to preserve the work until the end of the contract," and it attempted to meet that goal through its numerous proposals.  Tr. at 385.  That District 26 had that goal in mind is demonstrated by the fact that it amended its final proposal so that, instead of requiring Pratt to commit to keeping work in Connecticut throughout 2010 and a successor agreement, Pratt only needed to commit through 2010.  <u>Compare</u> Ex. 81 at Item 12 <u>with</u> Ex. 82 at Item 12.  Gladstein testified that: "The reason our committee changed that proposal was because our commitment to the company in wage concession and changes was only to the end of the contract December 5, 2010, and so we backed off of requiring the company to make a commitment to us to go beyond 2010.  We would address that in contract negotiations."  Tr. at 358.

reverberated throughout the trial.  District 26 identified instances in which Pratt either ignored financial analysis centered around cash savings or refused to consider proposals that generated cash as opposed to EBIT value.  See, e.g., Tr. at 873-74 (Hutton explaining that Pratt did not tell District 26 that $53.8 million of savings it presented to District 26 would be reduced by the amount of its dividend payments to joint venture partners in Singapore and Japan because "we were presenting EBIT data" and because "EBIT is just that, it is EBIT");[35] Tr. at 1069-70 (Bhalla explaining that Pratt did not assign any value to the State's proposal to lift a cap on corporate tax credit largely because that measure had "no impact on earnings" and only "would have a cash impact").[36]  Pratt justified this position by offering extensive testimony that described its accounting practices and how those practices rely on EBIT as the key measure for Pratt's financial performance.  EBIT, or "earnings before interest and taxes," is used by Pratt primarily because it is the rubric by which the investment community "evaluate[s] the performance of the business unit, looking at whether or not earnings grow year over year."  Tr. at 1041.

Despite Pratt's insistence that it was justified in only considering EBIT savings because it consistently used EBIT as its accounting benchmark, the court concludes that Pratt's position is myopic and untenable in the context of its Letter 22 obligation to use "every reasonable effort" to preserve the work.  The potential existence of

_____

[35] The particular issue of Pratt's dividend payments to its joint venture partners in Singapore and Japan, and the issue of whether Pratt failed to communicate information about the existence of those payments to District 26 or improperly failed to include those payments in its financial analysis, is discussed in greater detail in III.B.2.b. infra, at 53-58.

[36] The particular issue of whether Pratt valued the State's proposal in good faith is discussed in greater detail infra, at 58-62.

significant value, even in non-EBIT form, should have factored into Pratt's analysis.

First, as Pratt frequently points out, Letter 22 states that Pratt must pursue the goal of

preserving work "while giving reasonable consideration to the Company's own interests,

including the profitability of its operations."  While Pratt may have an interest in viewing

its finances through an EBIT lens, Letter 22 specifically references "profitability," which

the court does not interpret as EBIT.[37]  Thus, non-EBIT savings that nonetheless make

Pratt more "profitable" should have been considered.  Further, although Pratt attempted

to show that its commitment to EBIT-level analysis was fiercely consistent, the record

demonstrates Pratt had real concern for non-EBIT based savings.  Pratt cited its

reduction of Cheshire's inventory which "reduces cash and improves cash flow" as one

of the steps it took to preserve bargaining unit work.  Tr. at 86-87.  Additionally, when

asked what metric Pratt uses to evaluate the financial performance of engine centers,

Mayes answered, "we look at EBIT and in inventory terms, which is representative of

cash flow."  Tr. at 154.  In addition, Pratt frequently considered a particular proposal's

net present value based on cash, not EBIT.  See, e.g., Ex. 11 at 18 (August 2008

valuation of Cheshire closure which includes asterisk indicating "NPV includes impact of

partner share"); Tr. at 1010-1011, 1077.  Indeed, at oral argument, Pratt's counsel

stated unequivocally and correctly that Pratt did "consider cash."  Specifically, he

---

[37]  This conclusion is based on numerous factors.  First, in drafting Letter 22 of the CBA, the intention of the parties was to include "profits" in its general sense, not in an EBIT-only capacity and certainly not in a strict GAAP definition.  Had Letter 22 meant to allow Pratt to consider its earnings or EBIT (earnings before interest and taxes), it would have been written with that word and not "profits" and "profitability."  Further, the record does not indicate that District 26 ever expected "profits" to refer to EBIT.  Finally, with respect to Pratt's joint venture partnerships, *Pratt's* "profits" at those facilities cannot include the profits of Pratt's joint venture partners.  See CBA at Letter 22 § 2(B)(4) (". . . while giving reasonable consideration to the Company's own interests, including the profitability of *its* operations") (emphasis added).

stated: ". . . when we tell the Union that it's 3.6 years to pay back [the initial investment required to implement the restructuring plan] for Cheshire, that's not earnings, that's based on cash.  When we tell them the same thing for CARO, it is based on cash. When we start to look at pay back, we did consider cash and the evidence is undisputed about that."  Transcript of Oral Argument ("Tr. of Oral Arg.") at 54.  These representations to the court, along with considerable evidence in the record, make it apparent that Pratt frequently evaluated the cash value of its business strategies.  That Pratt did consider cash in executing its business judgment demonstrates that non-EBIT savings *does* have real value for Pratt, and highlights the unreasonableness of Pratt's position to give weight only to EBIT level savings.  Giving "reasonable consideration to the Company's own interests" does not include ignoring real benefit to Pratt and UTC. CBA at Letter 22 § 2(B)(4).  Pratt cannot use its preference for EBIT to undermine evidence that there may have existed cash value to keeping work in Cheshire and CARO that Pratt never considered.

To be sure, Pratt may structure its accounting as it sees fit.  However, in evaluating whether Pratt made "every reasonable effort" to preserve bargaining unit work, this court need not follow Pratt's lead in its claimed, talismanic reverence for EBIT.  Furthermore, while the court later addresses the specific ways that Pratt's position to value only EBIT savings skewed its valuation of its own proposal and the proposals of the State and District 26, see infra at 53-62, the court now concludes that maintaining this inflexible position to consider only EBIT savings itself supports the conclusion that Pratt did not pursue "actively and in good faith the goal of preserving" the work of the bargaining unit.

Overall, the record conclusively demonstrates that Pratt erected its own rigid framework for considering Cheshire and CARO plans: (1) savings had to recur through at least 2013, and (2) savings had to be in EBIT form only.  Pratt then demanded that District 26 adopt that framework itself and meet Pratt only on its terms.  Pratt's arbitrary selection of 2013 as the applicable temporal period, and Pratt's insistence that District 26 and State offers impact EBIT savings, were not reasonable.[38]

Furthermore, even if Pratt had good reason to desire EBIT savings through 2013 as opposed to any other savings for any other duration, Pratt's obligations under Letter 22 extend beyond only considering proposals that it deems satisfies particular requirements that it has constructed.  Were it otherwise, Pratt could avoid its Letter 22 obligations merely by contriving sacrosanct criteria and benchmarks that posed insurmountable obstacles it knew District 26 could not overcome, and Letter 22 would be stripped of its value.  That Pratt undertook such a narrow-minded approach indicates that it was not, in fact, making "every reasonable effort" to preserve work in Connecticut, as Letter 22 provides.

---

[38]  Additionally, the court notes that Pratt's last, best, and final offer, made on September 11, 2009, demanded that the Union make concessions that Pratt valued at $156 million in NPV-cash terms, whereas by Pratt's own calculations, its plan to close Cheshire and CARO and transfer the work to other facilities was worth $106 million to Pratt in NPV-cash terms.  See Ex. 65 at 3, 10.  Although Bhalla testified that these figures are not accurate because they credit Pratt's last, best, and final offer with savings beyond 2013, Bhalla also testified that, for the four-year period that this proposal applied to, Pratt's last, best, and final offer to District 26 would generate a "much greater" NPV than the closure plans afforded over that period.  See Tr. at 1081-85; Tr. of Oral Arg. at 88.  Pratt justifies the fact that they asked District 26 to create *significantly more* cash savings than its plan for closure would generate on the basis that Pratt's accounting prioritizes EBIT, not cash.  Nonetheless, the court concludes that the disparity between the closure plan's cash value to Pratt and Pratt's last, best, and final offer's cash value to Pratt further demonstrates that Pratt did not actively and in good faith pursue the goal of preserving bargaining unit work.

b.      Pratt's Valuation of its Plans to Close Cheshire and CARO

District 26 also argues that Pratt, when it valued its plans to close Cheshire and CARO and move bargaining unit work to other Pratt facilities as worth $53.8 million of recurring savings, did not pursue "actively and in good faith the goal of preserving the work" of the bargaining unit.  District 26 offers three reasons why Pratt's $53.8 million valuation is skewed.  First, District 26 argues that the $53.8 million calculation is inaccurate because it does not take into account the fact that Pratt would only benefit from a fraction of the restructuring plan's predicted savings attributable to joint venture facilities (ESA, TOS, and JTT) because 49% (33% for JTT) of those facilities' revenue were the joint venture partners' share.  Second, District 26 argues that, because Pratt not only failed to consider the joint dividend payments in its calculation of the closure plan's value, but also failed to adequately notify District 26 that the $53.8 million target figure did not account for the joint venture partners' share, Pratt did not make "every reasonable effort" to preserve bargaining unit work, or meet and confer in good faith.  Finally, District 26 contends that Pratt's savings projections were highly speculative.

i.      Joint Venture Dividends.  At the center of Pratt's restructuring scheme is the transfer of work from Connecticut to ESA, TOS, and JTT.  These transfers will generate significant savings, largely on account of less expensive labor costs in Singapore and Japan.  Nonetheless, because the ESA, TOS, and JTT facilities are joint ventures in which Pratt owns a majority share, 49% of earnings accrued at ESA and TOS, and 33% of earnings accrued at JTT, belong to Pratt's joint venture partners.  See Exs. 88, 89.  Therefore, even though Pratt counted 100% of those earnings in arriving at its calculation that the restructuring will create $53.8 million in recurring savings, in

-53-

actuality Pratt will ultimately only benefit from 51% and 66% of the earnings from these facilities.  It was forecasted that the joint venture partners' shares will together amount to approximately $13 million of the $53.8 million that Pratt claimed it would achieve as "recurring savings."

District 26 argues that, had Pratt actively and in good faith pursued the goal of preserving the work of the bargaining unit when it evaluated its closure plans, it should have reduced the "savings" those plans were forecasted to generate by the amount attributable to the joint venture partners' share.  When it gave District 26 and the State of Connecticut the $53.8 million target number, Pratt admits it did not take into consideration the fact that the inclusion of the joint venture partners' share overstated the benefit to Pratt in the move to ESA, TOS, and JTT.  Pratt justifies its position by asserting that "dividends are cash," whereas the savings value it communicated to District 26 and the State were predicated on EBIT value.  Tr. at 551.

As discussed earlier, supra, at 48-52, the court rejects Pratt's argument that, because it generally emphasizes EBIT in its accounting and financial analysis, it was reasonable for Pratt to ignore any non-EBIT savings in its consideration of the restructuring plans and any alternative proposals.  That it is unreasonable for Pratt to ignore non-EBIT value is illustrated by the very fact that Pratt uses its preference for EBIT to justify ignoring that approximately $13 million of its $53.8 million of projected, "recurring EBIT savings" -- that it insisted District 26 come up with to keep work at Cheshire and CARO -- was its partners' share.  Nor is the court persuaded by Pratt's argument that it was justified in ignoring the joint venture payments because the joint ventures "don't have to pay it until we, as a board of directors, agree to."  Tr. at 1077.  It

-54-

is irrelevant whether the joint venture chooses to distribute dividends because no matter how the joint venture chooses to use its earnings, the minority partner will still own 49% or 33% of its joint venture assets.  Pratt's share from any savings is 51% or 66%, not 100%.  Pratt's Warters made this unequivocally clear in a May 8, 2008 email to other Pratt officials: "JTT sales/EBIT are consolidated, but the partnership fee washes out the real impact so we feel only our share despite at the end of the day despite [sic] what gets accounted."  Ex. 102.  Ultimately, then, that Pratt failed to consider the fact that the realized value of the restructuring plan would be reduced by the joint venture partners' share indicates that Pratt's $53.8 million target figure was not formulated in a good faith pursuit of the goal of preserving work at Cheshire and CARO.  As such, Pratt violated its obligation in Letter 22 to pursue "actively and in good faith the goal of preserving" the work.

ii.    Failure to Communicate Existence of Joint Venture Payments.  An additional dimension of the joint venture issue is whether Pratt violated Letter 22 by failing to notify District 26 that any earnings from ESA, JTT, and TOS would be reduced by the joint venture shares.  Pratt's Hutton testified that, to his knowledge, no one told District 26 about the joint venture payments during meet and confer because "we were presenting EBIT data.  EBIT is just that, it is EBIT."  Tr. at 874.  Warters testified that, when Pratt informed District 26 its closure plan would generate $53.8 million in recurring savings, Pratt did not disclose that this amount would be reduced by approximately $13 million that belonged to the joint venture partners.  Tr. at 1013. McCarthy, the President of Local 1746A, testified that, based upon his interactions with Pratt officials, he was aware of the dividend payments, but he was under the

impression that they were "built into the business case," i.e., the $53.8 million figure was Pratt's savings and its joint venturers' shares were not included in that figure.  Tr. at 1159.

The court finds that Pratt never effectively explained the joint venture arrangement and its impact on Pratt's claimed projected value of closing Cheshire and CARO.[39]  Although Pratt made an effort to clearly indicate that a portion of the value of the restructuring plan belonged to joint venture partners when it drafted internal documents, see Exs. 88, 89, that effort was not made in Pratt's communications with District 26.  Furthermore, when Pratt generated a document to be distributed internally that assessed the value of the Cheshire restructuring plan in August 2008, the NPV forecast included an asterisk stating: "NPV includes impact of partner share."  Ex. 11 at 18.  In a similar document given to District 26 during the meet and confer process, the NPV forecast included no such advisement regarding the impact of the partner share. See Ex. 546 at 19.

In light of the court's assessment of the record, the court concludes that Pratt failed to adequately describe the impact of the joint venture partnership arrangement upon the "recurring savings" it claimed its restructuring plan would achieve.  Had Pratt been "pursuing actively and in good faith the goal of preserving" bargaining unit work, it would not have withheld this critical information from District 26's representatives.

---

[39]  Nor is the court assuaged that McCarthy and District 26 could have simply asked their adviser, Neil Gladstein, for assistance.  Gladstein testified that in his review of the documents produced to District 26, and in his attendance at four meet and confer sessions, he does not recall Pratt ever disclosing that the $53.8 million would be reduced by dividends paid to joint venture partners.  Tr. at 443-44.  Pratt has suggested that District 26 could have relied on Gladstein's assistance on this accounting issue.  However, it also bears noting that Pratt acknowledges that Gladstein was a C.F.A., not a C.P.A.

iii.    Uncertain Nature of Savings.   Pratt consistently demanded that District 26 find "hard" savings worth $53.8 million (less any "extra value" that might be added by Pratt, as noted, infra, at 69-75).  At the same time, however, its own forecast that closing Cheshire and CARO would generate $53.8 million of recurring savings was not a "hard" projection.  As of August 2009 when Pratt communicated the $53.8 million figure, Pratt believed closing Cheshire would create $33.6 million in recurring savings, while closing CARO would create $20.2 million in recurring savings.  However, only six months earlier in February of 2009, Pratt had predicted that its plan to close Cheshire would offer $43 million in recurring savings (23% greater than August), while its plan to close CARO would offer $12.7 million in savings (37% less than August).  Compare Ex. 28 (February 2009 projections) with Ex. 546, 547 (August 2009 projections).  In light of this fluctuation in the calculations, the court finds that Pratt's analysis of the value of its restructuring plans was not as "hard," or certain, as the certainty of value that Pratt demanded any District 26 proposal must provide.

Pratt defended its $53.8 million estimate at oral argument by acknowledging that there are numerous factors that must be considered in making these calculations, including cost structures and volume.  See Tr. of Oral Arg. at 46-47.  Pratt further stated that it must take action based upon what it knows in the present and cannot dither until projections become realities.  Id.  To be clear, the court does not expect Pratt's projections of future earnings to be precisely certain, nor does the court expect Pratt to remain idle because it cannot be certain that its projections will eventually materialize.  There is also no question that there was uncertainty in several aspects of District 26's proposals.  Nonetheless, in assessing whether Pratt actively and in good faith pursued

the goal of preserving work at Cheshire and CARO, the court finds that Pratt was unreasonable in demanding that District 26 offer "hard" recurring savings of $53.8 million when that figure was not "hard" or certain itself.  Essentially, Pratt demanded that District 26 provide it with more certain savings than its own restructuring plans offered.  To assign zero value to what Pratt regarded as "soft" District 26 proposals, when it valued its own forecasts as 100% certain, shows that Pratt was not pursuing the goal of preserving the work in good faith nor considering District 26's proposal in good faith.  In this way, Pratt also breached its Letter 22 obligation to make "every reasonable effort" to preserve the work.  This, combined with the fact that Pratt failed to consider the joint venture partnership payments in calculating the $53.8 million figure, leads the court to conclude that Pratt breached the every reasonable effort clause of the contract.

> c.   Pratt's Failure to Pursue Actively and In Good Faith the Goal of Preserving Bargaining Unit Work in its Interactions with the State of Connecticut

During the meet and confer process, Warters advised Pratt officials that meeting with the State was an "appropriate and necessary step" in the process, largely because Pratt viewed the Second Circuit in the 2000 litigation as having criticized Pratt for not seeking the State's assistance.  See Ex. 52; see generally Tr. at 986-88.  Specifically, the Second Circuit stated that, while they "will not attempt to delineate with precision" what would fulfill Pratt's "every efforts" obligations, an indication that the Company has made serious efforts might include, inter alia, "good faith pursuit of reasonable concessions from the Union or the State that would reduce or eliminate the financial need to transfer work out of Connecticut."  District 91, 230 F.3d at 579.  Given that Pratt decided it would engage the State, the court concludes that Pratt had a duty to do so in

good faith to determine if assistance was available that would help preserve bargaining unit work.

The court finds that Pratt did not engage the State in good faith towards reaching that goal.  In particular, Pratt's valuation of the State's incentive package indicates that Pratt was not "pursuing actively and in good faith the goal of preserving" bargaining unit work.  Significantly, Pratt failed to assign any value whatsoever to incentives within the State's offer that did not impact EBIT, even where non-EBIT savings were embedded within those incentives.  In numerous documents, Pratt officials acknowledge that there is additional, non-EBIT value in the State's proposal.  <u>See</u>, <u>e.g.</u>, Ex. 61 (September 10, 2009 email exchange between UTC's Vice President of Industrial Relations, James Miller, and Thomas Bowler, Head of Human Resources for UTC, in which Bowler states "I read your note to say that there are 'real' savings beyond the 5m but that they just can't be assigned to cheshire.  So maybe UTC or broader Pratt would bebefit [sic] from those savings beyond the 5m."  In response, Miller confirms, "[t]here are other savings in the Governor's offer."); Ex. 62 (September 11, 2009 email from Miller to Bowler and others noting that, within the State's proposal to lift a cap on corporate tax credits, "there is the equivalent value of about $6-7M that would be legitimate to UTC's benefit (not Pratt CARO/Cheshire) with the removal of the 70% tax credit," even though Pratt assigned no value to this incentive in its assessment of the State's offer).[40]  Despite acknowledging this "real" value within the State's offer, Pratt officials assigned no value

---

[40] <u>See also</u> Ex. 68 (document comparing State's valuation of its offer with Pratt's valuation of that offer); Ex. 83 (internal Pratt document separating $5 million of "Cheshire/CARO Specific Value" from $17 million of "Other UTC Value").

to this aspect of the State's offer.  Indeed, Bowler even stated that he would "feel better if all there is for real savings is the 5m," the value assigned to the State's offer by Pratt. Ex. 61.  Eager to minimize the perceived value of the State's offer so as to justify implementation of the restructuring plans, Pratt was not actively and in good faith pursuing the goal of preserving bargaining work.

As discussed, <u>supra</u>, at 48-52, Pratt's decision to only consider EBIT-level savings is not reasonable, or undertaken in good faith.  As Pratt's own internal exchanges make clear, the State's proposal contained real savings that Pratt never included in its valuation.  Had Pratt acted in good faith, it would not have entirely ignored incentives that offered real savings for Pratt and UTC merely because those incentives did not impact the EBIT line.  The court therefore concludes that Pratt failed to evaluate the State's proposal in accordance with its Letter 22 obligation to make "every reasonable effort" to preserve bargaining unit work.

Context is given to Pratt's "consideration" of the State's offer by an email written by UTC's President, Louis Chenevert.  On September 10, 2009, UTC employees were preparing to participate in a call with "the senators."  Chenevert had been asked whether he should participate in this call.  Chenevert responded that he had talked to Hess, who had told Chenevert that, "[the caller's] request is to not go ahead with Cheshire," which Chenevert stated he "will not support.  We better wait before we set up the call with him."[41]  Ex. 60.  In other words, before District 26's last, best, and final

---

[41]  Pratt argues that this merely went to the timing of the call.  <u>See</u> Def.'s Ppd. Fdgs. at 24 n.9 (citing Hess' testimony).  However, Hess testified he "quite honestly [doesn't] recall the context of this email."  Tr. at 1151.

offer was even made on September 11, 2009, which included the State's offer, UTC's President was intent on closing Cheshire.

In addition, although Pratt assigned less value to the State's offer than either the State or District 26 because numerous incentives generated cash, not EBIT savings, Pratt never identified this EBIT issue to the State.  Pratt told the State that its restructuring plans would achieve "annual recurring savings."  Ex. 559.  Further, although the State informed Pratt on or around September 15, 2009, that there might be an additional $10-12 million in funding to keep the work in Cheshire and CARO if Pratt and District 26 got "close" to reaching an agreement, Pratt never got back in touch with the State before finalizing its decision.  While Bhalla justified this failure to reengage the State by claiming that the parties never got "close," Tr. at 1108, the court concludes that Pratt and District 26 were sufficiently close for renewed contact with the State to be reasonable.  This conclusion is predicated on both the court's own assessment, and the assessment of Pratt's Kallman that the parties "got close" and "were able to close the gap substantially."  Tr. at 616.

Pratt's overall conduct conclusively demonstrates that Pratt was not pursuing in good faith the goal of preserving work during its interactions with the State or other government officials.  Pratt failed to assign the full measure of value that Pratt itself perceived within the State's offer and, when this appraisal issue was raised internally, UTC's Head of Human Resources stated that he would "feel better if all there is" for real savings is the $5 million.  Ex. 61.  Further, UTC's President had decided before the conclusion of the meet and confer not to support any plan that did not involve "going ahead" with closing Cheshire and Pratt did not seek additional contact with the State

after it became clear additional funding may have been available.  The court concludes

that Pratt did not pursue "actively and in good faith" the goal of preserving collective

bargaining work through its interactions with the State and other government officials.

> d.      Other Efforts Pratt Made Were Not Taken With "Goal Of
> Preserving Work"

Pratt attempts to show that it satisfied its "every reasonable efforts" obligation

through its efforts to increase efficiency at Cheshire and CARO.  Pratt took numerous

steps to improve performance at the two facilities.  At Cheshire, Mayes sought to

reduce labor costs by eliminating certain salaried (non-Union) employees from the

payroll.  He also continued to attempt to grow Cheshire's business by cultivating

additional customer contracts; by reducing inventory; by investing in additional tooling;

and by attempting to reinvigorate the plant with new management.  With respect to

CARO, Hutton's partially-implemented, "focus parts" strategy had real success in

improving CARO's efficiency.  Further, in 2008, Pratt invested in new equipment and

sought to renovate equipment that CARO already had in operation.  Pratt claims that

these efforts satisfy its Letter 22 obligations because, by improving efficiency and

profitability, these measures were aimed at preserving work.

At trial, District 26 asserted that preserving work had no bearing on the decision

to implement these measures, and that they were instead exclusively designed to

enhance efficiency.  Pratt contends, however, that "nothing in the CBA prevents Pratt's

efforts to preserve the work from having the secondary effect of also improving overall

business performance."  Def.'s Ppd. Fdgs. at 45.  Moreover, Pratt argues that it is a

well-settled principle that a party's intent is immaterial to whether a contract has been

breached.

The court agrees with Pratt's basic argument that Letter 22 does not require that efforts to preserve work be mutually exclusive from efforts to enhance efficiency and performance.  The court also agrees with the proposition that, generally speaking, intent is immaterial to assessing whether a party has breached a contract.  See Koufakis v. Carvel, 425 F.2d 892, 906 (2d Cir. 1970) ("A breach is a breach; it is of marginal relevance what motivations led to it.").  Nonetheless, Letter 22 specifically defines "every reasonable effort" as "*pursuing* actively and in good faith the *goal* of preserving the work."  CBA at Letter 22 § 2(B)(4) (emphasis added).  While intent may be irrelevant to whether a party has breached a contract, Letter 22's language provides that a component of Pratt's obligation includes that the object of its actions must be the pursuit of the particular goal of work preservation.  Id.  Therefore, the court concludes that, under Letter 22, it is insufficient to undertake efforts to pursue another goal -- like efficiency or enhanced profitability, for example -- and then claim that those pursuits satisfy Letter 22 because they have the ancillary effect of preserving work.

The record reveals that this is exactly what occurred: Pratt had the goal of increasing profitability, but not the goal of preserving work.  Specifically, with respect to Cheshire, during the time Mayes implemented improvements to the facility, Mayes was pursuing the short-term strategy of improving profitability and enhancing performance while he simultaneously advanced a long-term strategy of closure.  See Ex. 15 at 9; Ex. 11 at 26.  It is apparent that enhancing business performance was not a "secondary effect" of these measures as Pratt claims.  To the contrary, in light of Mayes' long-term-strategy recommendation of closure, these measures were taken solely to enhance

productivity and were not implemented with the goal of preserving the work. With respect to CARO, the court finds that Hutton did act with the goal of preserving work in opting to recommend a focused-parts strategy over closure in 2007. Nonetheless, in 2008 he suspended the "focused parts" effort, and, upon recommending closure in February of 2009, the goal of preserving the work was seemingly abandoned. Indeed, by June 2009, Hutton himself made it clear that his efforts to improve CARO's performance were only being implemented in the event that Pratt would be unable to execute its closure plan. See Ex. 36 (defending moving work from DARO to CARO on the grounds that "we've unsuccessfully tried to close CARO more times than we all care to remember" because Pratt has "been burned by 'every reasonable effort language,'" and that "if no closure[,] than [sic] this is what gets us to a Silver shop that makes money" whereas, "the other way, if I can't close it, I'm stuck at break even and continued ugliness . . . .").

While these efforts may have made Pratt facilities more profitable (therefore possibly increasing the likelihood of retaining collective bargaining unit work), they do not evidence that Pratt pursued "the goal of preserving the work" actively and in good faith. These discreet measures taken at Cheshire and CARO cannot be sufficient to satisfy Pratt's Letter 22 obligations.

    e.  Pratt's Failure to Communicate Existence of Closure Plans

District 26 makes two arguments with respect to Pratt's failure to communicate the existence of its closure plans to District 26. First, District 26 contends that, had Pratt been pursuing actively and in good faith the goal of preserving the work in Connecticut, it would have communicated its operational plans with respect to Cheshire

and CARO well before July 21, 2009, even without any inquiry by District 26, so that District 26 might have been able to begin working with Pratt to preserve the bargaining unit work.  Second, District 26 argues that Pratt made misrepresentations to District 26 officials concerning Pratt's intentions with respect to Cheshire and CARO.  The court will address each of these claims independently.

      i.     <u>Failure to Notify District 26 of Closure Plans Earlier.</u>  In light of the fact that Pratt would ultimately ask District 26 to close a $53.8 million gap and modify the CBA to extend through 2013 -- both significant endeavors -- during a 45-day meet and confer, District 26 argues that Pratt should have informed District 26 it was considering closure earlier.  Pratt responds by asserting that it fully complied with Article 27 in providing District 26 with six-months notice of its closure plans.  Pratt further argues that the decision to close Cheshire and CARO was not finalized until just before the July 21, 2009 announcement.  Pratt offered testimony by the President of Pratt & Whitney (Hess) that he had not joined the recommendation to close the facilities until May or June of 2009.  Additionally, Pratt repeatedly noted at trial that restructuring plans could only be implemented with the financial support and managerial approval of UTC.  In Pratt's view, because UTC did not finalize approval until just before the July 2009 announcement, any earlier communication to District 26 regarding the closure plans would have been premature.

      Although it seems as if Pratt could have communicated its decision earlier than July 2009, the fact that Pratt waited until then does not constitute a breach of Letter 22. While Hess' testimony that he had not rendered a final decision until May or June of 2009, stands in tension with Kallman's statement that Hess agreed with the closure

plan by January of that year, the court finds credible Hess's assertion that, having only been appointed to his position on January 1, 2009, it would have been unlikely that he would make any final decision with respect to Cheshire and CARO in January.  See Tr. at 520, 1116.  To be sure, the record clearly supports the conclusion that all other members of Pratt's Executive Committee were recommending closure of the facilities by January of 2009, and further indicates that there was no real opposition to the restructuring plans from the moment they were initially considered.  Moreover, that the Board of UTC gave approval to fund the projects on March 10, 2009, casts real doubt over whether Hess indeed waited until May or June to make his decision regarding Cheshire and CARO.[42]  Nonetheless, in light of the fact that Pratt complied with the Article 27 notice provisions, and in consideration of Hess' testimony and Pratt's internal procedures for acquiring restructuring approval from UTC, the court finds that Pratt's failure to communicate its restructuring plans in advance of July 21, 2009, does not constitute a breach of Letter 22.

The court agrees with District 26 that, had Pratt notified District 26 of its plans to close Cheshire and CARO earlier in 2009, there would have been a greater likelihood that the two parties may have been able to preserve bargaining unit work.  Indeed, if Pratt had made its decision well in advance of July 21, 2009, and had failed to inform District 26 of its decision, the court would have struggled to conclude that Pratt had pursued "actively and in good faith" the goal of preserving bargaining unit work,

---

[42] It appears odd to the court both that Pratt would present a restructuring plan to UTC that the President of Pratt had not yet approved of on February 13, 2009, and that UTC would approve funding a plan regarding Pratt operations, without the Pratt President's support.  The court therefore infers that, while Hess did not decide in January to support closure, he decided to do so before May or June.

regardless of whether Pratt had abided by the terms of Article 27.  Nonetheless, the record does not demonstrate that such a conclusive decision was made significantly earlier than July 2009.  For that reason, any claim that Pratt's actions precluded District 26 from preparing its members for a vote is unpersuasive.

ii      Misrepresentations.  On two occasions prior to July 21, 2009, District 26 officials specifically inquired as to whether Pratt had a plan to close CARO or Cheshire. First, during a meeting in February 2009, McCarthy, President of Local 1746A, the division of District 26 that represents Cheshire employees, asked whether there existed a plan to close Cheshire.  Pratt's Warters responded that Pratt looked at everything all the time, and that there was no bigger review for Cheshire than there had ever been.[43] Tr. at 657.  Later, in April of 2009, after receiving what appeared to be a Pratt document that contained timelines for closing Cheshire and CARO, Parent, President of District Lodge 26, asked Warters if there was a plan to close Cheshire.  Warters indicated that, while the CARO situation had the potential to produce an official notice of closure in 2009 and might "ruin their summer," Cheshire appeared strong and out of danger.  Tr. at 319.

Regarding Warters' February 2009 statement to McCarthy that there was no greater review of Cheshire being done than there *ever* has been, no testimony was offered to demonstrate that this was, in fact, a misrepresentation.  However, as of Warters' comments to Parent in April 2009, the UTC Board had already voted to

_____

[43] Although Warters did not admit at trial that he offered the "no bigger review" statement to McCarthy, during an earlier deposition he testified that he did make that statement, and the court credits McCarthy's testimony.

approve funding for restructuring plans, including the plans for Cheshire and CARO. The court concludes that Warters' comment regarding Cheshire being strong and "out of danger" was entirely inaccurate considering the stage Pratt's planning was then at, including the UTC vote.  Although nothing in the record indicates that there was an independent "duty to disclose," Warters' comment was a misrepresentation that is inconsistent with Pratt's duties under Letter 22, especially its pursuit of the goal of preserving the bargaining unit work in good faith.  Viewed on its own, this incident would likely not constitute a breach of Letter 22.  However, when considered together with the rest of the record, the misrepresentation forms one additional piece of the larger picture that indicates Pratt did not comply with its Letter 22 obligations.

        f.       Conclusion Regarding Pursuing Actively and in Good Faith the Goal of Preserving Cheshire and CARO Work

Pratt's actions demonstrate that, throughout its decision-making process leading up to the July 21, 2009 announcement and during the meet and confer period that followed, Pratt did not pursue "actively and in good faith the goal of preserving" bargaining unit work as Letter 22 requires.  Pratt unreasonably insisted that the only acceptable District 26 proposal was one that would provide savings through 2013 and that it need not credit any savings initiatives suggested by either the State or District 26 that did not impact EBIT.  Pratt overvalued its closure plans by failing to consider payments to joint venture partners, conveyed those plans as more certain than they actually were, and failed to value the State and District 26's proposals in a way that assessed their "savings" in the same way it assessed "savings" in its own plans.  Pratt undervalued the State's proposal by failing to consider non-EBIT savings.  That Pratt

took efforts to enhance efficiency at Cheshire and CARO does not itself satisfy this aspect of Letter 22, because those actions were not taken with the goal of preserving bargaining unit work.  In light of these findings, the court concludes Pratt has breached Letter 22 by not pursuing actively and in good faith the goal of preserving the work at Cheshire and CARO.

### 3.      Assignment of Extra Value

As part of the "every reasonable effort" clause, Pratt is required to "assign extra value in its decision-making to choices that preserve. . . work in the bargaining unit."[44] CBA, Letter 22 at § 2(B)(4).  District 26 claims that Pratt never meaningfully assigned such extra value and thereby violated the terms of Letter 22.  Pratt responds by identifying numerous ways in which it assigned extra value during the meet and confer process to proposals that would keep work at Cheshire and CARO through the term of the CBA.

First, Pratt notes that it did not demand that District 26 formulate a proposal that achieved the entire $53.8 million in recurring savings that Pratt's restructuring plans would generate.  Instead, Pratt was willing to accept a proposal that provided just over $40 million in recurring savings.  Pratt contends, therefore, that it assigned 20% of $53.8 million, or approximately $14 million, of extra value to choices that would preserve work in Connecticut.  Second, Pratt contends that, in offering a proposal that

---

[44] The court acknowledges that the "extra value" clause is not independent of the "every reasonable effort" clause of Letter 22.  The "extra value" clause does not create an independent contractual obligation, but instead further defines the scope of Pratt's duty to take "every reasonable effort."  See CBA at Letter 22 § 2(B)(4).  Nonetheless, for clarity's sake, the court has addressed "extra value" separately from the "pursuing actively and in good faith" portion of Letter 22 as it relates to Pratt's alleged breach of the "every reasonable effort" provision.

only endured through 2013, it was willing to sacrifice the extra value beyond 2013 that its restructuring plan would create.  Third, Pratt points to the fact that it credited District 26's proposal with the full amount of wage reductions for military contracts, even though 39% of those reductions passed through to the government as part of Pratt and the government's contractual arrangement.[45]  This figure amounts to $10.8 million.  Pratt also assigned $3.1 million of value to the proposed movement of work from DARO to CARO, which, according to Pratt, included $2.5 million of built-in extra value.  Finally, Pratt valued the State's Job Retention Tax Credit at the full $4 million figure calculated by the State, even though the need to reduce employment levels led Pratt to believe that this incentive was actually only worth $2.5 million.

The court finds the majority of these "extra value" assessments to be accurately evaluated.  However, Pratt cannot claim both that it (1) assigned a 20% premium for

---

[45] The parties offered the following Stipulation in order to help explain this contractual scheme:

> Military contracts take two forms: cost type and fixed type.  Cost type contracts require that any reductions in actual hourly direct labor wage rate (including overtime) are passed on to the government.  Any such savings are passed on to the military customer immediately, in the form of twice monthly billings.  Fixed price contracts are based on current negotiated labor rates set forth in the military contracts.  The contractual fixed labor rates are adjusted annually to reflect any labor rate changes.  Any reductions in the cost of wages (including overtime) are factored into the new rates on a dollar for dollar basis for the next year's fixed rates.  Accordingly, a $1 reduction in labor cost in 2010 is passed on immediately to the military customer in a cost type contract.  The same $1 in labor cost savings in a fixed price contract would not be passed along to the military customer until the new fixed labor rate is set for 2011.

The parties further stipulated that, for the purposes of this litigation, "there are currently no cost type or fixed price type military contracts in place with expiration dates beyond December 31, 2011."  In light of this fact, any extra value attributable to this item should only apply to the years 2010 and 2011.  Pratt, however, maintains that this value exists beyond 2011.  The court concludes that the "pass through" figure of $10.8 million is overstated for the term beyond 2011.  Pratt counts those savings through 2013 even though there are no such contracts that are in effect beyond 2011.  Even if it were likely true that contracts would be renewed after 2011, this "extra value" cannot said to be as equivalently certain as the 2010 and 2011 figures.

keeping work in the bargaining unit, thus only requiring District 26 to find roughly $40 million in recurring savings, and (2) assigned extra value by crediting District 26 with producing recurring savings in the form of military contract wage cuts that would pass to the government, not Pratt (roughly $10.8 million). <u>See</u> Tr. of Oral Arg. at 82. In its last, best, and final offer of September 10, 2009, Pratt requested that District 26 create $48.8 million of recurring savings (that number, together with Pratt's $5 million valuation of the State's offer, would reach Pratt's $53.8 million target). When asked at oral argument why Pratt was seeking from District 26 the full $53.8 million ($48.8 million from Pratt) as opposed to the "extra value" infused $40 million, Pratt responded that its proposal effectively only asked for $40 million, because included within the $48.8 million figure was the $10.8 million of savings that would pass to the government. <u>See</u> <u>id.</u> Therefore, Pratt can be said to have offered extra value in the form of a 20% premium for keeping work in Connecticut, or it can be said to have offered extra value in the form of crediting District 26 with the value of the 39% of wage cuts that it viewed would pass to the government, but it cannot be said to have offered extra value in both ways.[46]

This double-counting issue aside, the court finds that Pratt did assign extra value during the meet and confer process in the variety of ways it identifies. Indeed, District 26 acknowledges many of these calculations as accurate. Nonetheless, District 26 maintains that Pratt did not honor Letter 22 because it did not assign extra value to

---

[46] The court does not suggest that Pratt attempted to mislead District 26 or this court into thinking that it assigned more "extra value" than it actually did. Rather, the court has provided this explanation -- regarding the fact that Pratt cannot claim both (1) the 20% premium of extra value, and (2) the $10.8 million of projected savings that Pratt views would pass to the government -- only for the sake of clarity.

choices that would keep work in the bargaining unit until *after* the meet and confer process had begun.  Pratt responds by contending that the language of Letter 22 makes it patently clear that Pratt had an obligation to assign extra value in its "decision-making" and, because Pratt's decision-making process extended into the meet and confer period, the extra value it added at that time satisfied its Letter 22 obligations.

The placement of the extra value provision within sub-paragraph 2(B)(4) of Letter 22 leads the court to a contrary conclusion.  Immediately following the extra value clause, section 2(B)(4) states: "As part of any 'meet and confer' process undertaken pursuant to Article 27, the Company will describe the efforts *made* to comply with this Letter . . . ."  CBA at Letter 22 § 2(B)(4) (emphasis added).  This clause clearly indicates that efforts to comply with Letter 22, including efforts to comply with the extra value provision, must be taken *before* the commencement of the meet and confer period. This interpretation is further supported by Article 27, which states: "The Company will give notice of its intent to close a plant or transfer a business unit, department, cell, or any part of an operation a minimum of six (6) months in advance of any movement of employees resulting from such intent."  CBA at Art. 27.  In light of this language, the court concludes that the CBA recognizes the formulation of an "intent to close" as a "decision" that Pratt makes.  Because Pratt would have already formed an "intent" to close by the start of meet and confer, the court determines that the obligation to assign extra value cannot be read to begin only once meet and confer has started.  By that point, Pratt had already made the decision that it intended to close.  See Ex. 44 (July 13, 2009 email from Bowler to UTC officials stating that "once we announce we are evaluating our options, subject to normal contractual deliberations, we have effectively

-72-

announced our planned intent other than a persuasive case by the union that we should change our minds."); Ex. 49 (July 19, 2009 email from Bowler to Miller regarding talking points which states "[m]ight be better to say that the *decision* to launch the contractual process is final and that we are ready to engage with the union on this matter.") (emphasis added).  Clearly, a decision had been made to send an Article 27 notice of intent to District 26.

Furthermore, the "extra value" provision must be interpreted to create an obligation before meet and confer because only this interpretation of Letter 22 ensures that no language "is rendered superfluous."  District Lodge 91, 230 F.3d at 576.  Were Pratt's interpretation correct, Pratt could eviscerate the extra value clause of any significance by merely assigning an amount of "extra value" during meet and confer that it knows to be insufficient to accomplish the objective of preserving collective bargaining unit work.  Therefore, the court's interpretation best gives meaning to every provision of Letter 22 and ensures that the "extra value" clause impacts upon the "decision-making" of Pratt officials.  As such, the court concludes that, to satisfy its Letter 22 obligations, Pratt needed to have assigned extra value to choices that preserved the work in making the decision to intend to move, not just during meet and confer.

The record reveals that no assignment of extra value was made prior to July 21, 2009.[47]  With respect to Cheshire, in formulating his recommendation that Cheshire close in 2010, Mayes assigned no extra value to alternative choices that would have the effect of preserving collective bargaining unit work.  Additionally, in each of Mayes'

---

[47]  In its post-trial submissions, Pratt only listed events occurring after July 21, 2009, in identifying extra value it assigned.  See Def.'s Ppd. Fdgs. at 32 n.11.

presentations regarding the closure plan and its alternatives, no amount of extra value was ever added to the alternative choices that would keep work within Connecticut. See, e.g., Exs. 9-12.  With respect to CARO, Hutton offered no testimony that the assignment of extra value was in any way a factor in his analysis when he formulated the recommendation to close CARO.  Moreover, much like Mayes' presentations regarding the Cheshire plan, presentations that evaluated the closure of CARO do not contain any extra value for choices that would keep work at the CARO facility.  See, e.g., Ex. 28.

At oral argument, Pratt insisted that, even if the extra value provision were interpreted as imposing obligations upon Pratt before July 21, 2009, Pratt satisfied those obligations.  Specifically, Pratt contends that its evaluations of the closure plans and their alternatives revealed that the disparity in savings between implementing the plan to close Cheshire and CARO, and implementing any other plan, would be so large that extra value would be incapable of making any material difference.  Tr. of Oral Arg. at 75.  The court is not persuaded by this argument.  First, while Pratt's counsel suggests that Pratt "implicitly" executed its extra value obligations in evaluating these proposals, nothing in the record suggests that the notion of assigning extra value to choices that kept work in the bargaining unit ever *actually* factored into Pratt's analysis that led to its decision to intend to close.  Furthermore, Letter 22 provides specific measures that Pratt must undertake "actively and in good faith" to preserve the work; Pratt cannot claim to have satisfied Letter 22 by asserting those measures would not have succeeded even if they had been taken.  Letter 22 does not merely require Pratt to take those actions Pratt believes will succeed, but rather requires Pratt to follow a

-74-

particular process and attempt every reasonable effort to preserve bargaining unit work, even if those efforts might ultimately fail.  Indeed, that Pratt *can* transfer work during the life of the CBA -- so long as its Letter 22 efforts to preserve work are adequate but unsuccessful -- indicates that, by the very nature of Letter 22, the provision envisions some efforts will fail.  Moreover, Pratt's contention at oral argument relies on the precise interpretation of the extra value clause that the court earlier dismissed.  The extra value provision of Letter 22 does not allow Pratt to assign extra value *after* its analysis has already been completed.  As noted above, were that interpretation adopted, the extra value provision would become a virtual nullity because Pratt could simply assign that amount of extra value that it knows to be insufficient to keep work in the bargaining unit. In order to ensure that this provision of Letter 22 is not rendered superfluous, the extra value clause must be read as an obligation that influences Pratt's actual decision-making, and not merely an obligation to assign extra value ex post.

Letter 22 specifically provides that, as part of making "every reasonable effort," Pratt will "assign extra value" in its decision-making to choices that keep work in the collective bargaining unit.  No assignment of extra value having been made before the meet and confer, the court concludes that Pratt breached Letter 22 by not assigning extra value in advance of forming its intent to close Cheshire and CARO.

4.    Conclusion

Ultimately, although the decision to close Cheshire and CARO may have made good business sense in light of the actual and potential volume losses and their relatively high costs, Pratt was nonetheless required by contract to honor the commitments it made in seeking to implement those closure decisions.  The record is

clear: Letter 22 was a key provision of the CBA and a significant element of negotiations in recent years.  The record further demonstrates that Pratt itself viewed Letter 22 as a limit upon its right as a business to close a facility and transfer that facilities' work to another plant.

Pratt breached its obligations under that Letter to make "every reasonable effort" to preserve work within the bargaining unit.  As discussed above, the court reaches this conclusion based largely upon Pratt's insistence that alternatives provide recurring EBIT savings through at least 2013, Pratt's failure to consider that a portion of the "savings" it claimed in assigning value to its restructuring plan were those of its joint venture partners, and Pratt's failure to pursue actively and in good faith the goal of preserving work in its interactions with the State.  The efforts Pratt made to improve Cheshire and CARO were implemented without regard to the "goal of preserving work" and thus cannot be considered to have satisfied its every reasonable effort obligation.  Further, the court concludes that Pratt breached its Letter 22 obligation because Pratt failed to assign extra value to choices that would preserve collective bargaining work as Letter 22 requires.

Although Pratt did not make "every reasonable effort" to preserve bargaining unit work, including explicitly treating workforce preservation as "extra value," the record demonstrates a very strong effort by Pratt to make the appearance of making "every reasonable effort."  As of June 2009, Pratt was focused on bolstering its legal position with respect to its "every reasonable effort" obligation, but very little indicates Pratt's actual execution of that obligation.  On June 2, 2009, Hutton wrote an email to various Pratt officials in support of a measure to bring more work into CARO.  Hutton was

adamant that "this movement of work to CARO does not, in any way, change or slow its potential closure," and Hutton also stated that "this action will only enhance our 'every reasonable effort' contract language." Ex. 36. That Pratt believed the movement of work to CARO would "enhance its 'every reasonable effort' contract language" at the same time it insisted that this very same movement of work will not "in any way change or slow. . . potential closure," is one demonstration of the court's conclusion that Pratt did not approach its Letter 22 obligations "actively and in good faith."

Perhaps most demonstrative of Pratt's failure to pursue "actively and in good faith the goal of preserving" bargaining unit work is the fact that, even setting aside the potential unreasonableness of the benchmarks it required District 26 to meet, near the end of the meet and confer Pratt was still unsure of what it would do if District 26's proposal actually met those benchmarks. On September 8, 2009, there was an email exchange between Warters and Amato, both of Pratt & Whitney. The exchange begins with Amato inquiring, "I think I heard rajeev [Bhalla] ask what we would say if the u [Union] came up with the 53 [million dollars]. I didn't hear an answer. Did anyone respond?" Ex. 59. Warters replied: "It morphed into a conversation about the quality of the savings offered up by the State at this point, so no." Id. It seems obvious to the court that, if District 26 were actually able to generate the target level of $53.8 million in recurring savings, Pratt would have had no question as to its response if it were acting in good faith: it would have accepted District 26's proposal.[48] That Pratt officials were

---

[48] The court views Amato's inquiry as asking what Pratt would say if District 26 came up with $53 million of recurring savings. Amato was not inquiring about Pratt's response to a one-year proposal worth $53 million, because, as Pratt's testimony thoroughly established, Pratt had informed District 26 that it needed recurring savings from the very start of the meet and confer process. See, e.g., Tr. at 1017-18. Quite simply, Pratt already had an answer formulated regarding what it would say if District 26 presented a

even asking this question as meet and confer *drew to a close* indicates that, during exchanges with District 26, Pratt was not actively and in good faith pursuing the goal of preserving work within the bargaining unit.

Indeed, the record reveals that Pratt was intent on closing Cheshire and CARO even as it sought to create the facade of making "every reasonable effort" to keep those facilities in operation.  Pratt approached the meet and confer not as a genuine opportunity to engage District 26 and the State to attempt to preserve work, but rather as a formality in which Letter 22 required it to nominally participate.  In a June 11, 2009 presentation made to UTC, Pratt discussed the circumstances involved in the "Transition," and stated: "6 months wait per contract before we can move."  Ex. 38 at 8. While Pratt identified its contractual obligation to "wait" until the move was possible, Pratt never identified its obligation to make every reasonable effort to preserve the work at the Cheshire and CARO facilities.

Despite claiming to have made "every reasonable effort" to preserve work in the bargaining unit, Pratt did not pursue that goal actively and in good faith, or by assigning extra value in its decision-making to choices that preserve the work, all as required by Letter 22.  Therefore, the court finds for District 26 on Count One.

B.   <u>Implied Covenant of Good Faith and Fair Dealing</u>

In Count Two, District 26 claims that Pratt violated its covenant of good faith and fair dealing implied in the CBA.  The Second Restatement of Contracts recognizes an

---

one-year proposal worth $53 million -- it would be inadequate because it was not recurring.  Amato's email reveals Pratt's uncertainty about how it would respond to an offer that met its target figure, over its target duration.

implied covenant of good faith and fair dealing in every contract, without limitation.  See 2 RESTATEMENT (SECOND) OF CONTRACTS § 205 (1979); see also Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 220 (1985) (bad faith claim rooted in contract could be brought under section 301).  "[G]ood faith performance of a contract 'emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party,'" while bad faith may be seen in "evasion of the spirit of the bargain, lack of diligence and slacking off, rendering of imperfect performance, abuse of power to specify terms, and interference with or failure to cooperate in the other party's performance."  Bank of China v. Chan, 937 F.2d 780, 789 (2d Cir. 1991) (quoting 2 RESTATEMENT (SECOND) OF CONTRACTS § 205 cmts. a, d.).  "To constitute a breach of [the implied covenant of good faith and fair dealing], the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith . . . .  Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive. . . .  Bad faith means more than mere negligence; it involves a dishonest purpose."  De la Concha of Hartford, Inc. v. Aetna Life Ins. Co., 269 Conn. 424, 433 (2004) (internal quotations marks omitted).

Letter 22 has been a critical issue for District 26 in past negotiations over collective bargaining agreements; Pratt understood that Letter 22 is of vital importance to District 26.  Moreover, Pratt understood that Letter 22 created real limitations upon its right as a company to close particular facilities and transfer work to other locations.  The

-79-

court has already found that Pratt breached Letter 22 by failing to make "every reasonable effort" to preserve bargaining unit work.  In assessing District 26's breach of good faith claim, however, the court must determine whether Pratt's conduct constituted an "evasion of the spirit of the bargain" or "a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive." Bank of China, 937 F.2d at 789; De la Concha of Hartford, Inc., 269 Conn. at 433.  For the reasons set forth below, the court finds that District 26 has met its burden and demonstrated that Pratt breached the implied covenant of good faith.

The record is replete with evidence that Pratt neglected to fulfill its duties under Letter 22 because of its interested motive in executing its own restructuring plans.  As discussed, supra, at 62-64, its efforts to enhance performance at Cheshire and CARO were taken while the Pratt officials charged with managing those facilities recommended closure; these were not genuine efforts to preserve work.  This conclusion is reinforced by Hutton's June 2, 2009 email, in which, during a discussion of a plan to move some work into CARO, he stated, "this movement of work to CARO does not, in any way, change or slow its potential closure."  Ex. 36. Hutton also stated that "this action will only enhance our 'every reasonable effort' contract language." Id. Contrary to District 26's expectations, Pratt did not faithfully "make every reasonable effort" to preserve bargaining unit work, but instead attempted to create an impression that it had made such an effort.  See supra, at 75-78.  The goals that actually drove Pratt's conduct are further revealed in a February 13, 2009 document that was presented to UTC.  In it, Pratt identified experiencing "little or no disruption to the

workforce" as one of its "goals and objectives," but Pratt never identified the goal of preserving bargaining unit work.  Ex. 28 at 2.

Furthermore, Pratt did not communicate with District 26 in good faith, either before the meet and confer period or after that period had begun.  First, upon being asked whether there existed a plan to close Cheshire in April 2009, Warters responded that Cheshire appeared strong and out of danger.  In reality, the plan to close Cheshire was proposed to UTC on February 13, 2009, and the UTC Board of Directors had already voted to approve funding of restructuring plans, including the plan to close Cheshire.  See supra, at 67-68.  Second, although Pratt claims to have made a good faith attempt to reach an agreement with District 26 during meet and confer that would have kept Cheshire and CARO open, the record indicates that Pratt made no such attempt.  Pratt identified a target number that District 26 had to achieve -- $53.8 million of recurring savings -- without telling District 26 that this figure included a portion of savings that Pratt would not actually benefit from, because it belonged to Pratt's joint venture partners.  Indeed, Pratt officials themselves acknowledged that, with respect to joint venture facilities, ". . . sales/EBIT are consolidated, but the partnership fee washes out the real impact so we feel only our share despite at the end of the day despite [sic] what gets accounted."  Ex. 102.  In its outward relations with District 26, however, there was no acknowledgment that the $53.8 million would include approximately $13 million that constituted the joint venture partners' shares.

Additionally, Pratt's assessment of District 26's offer was not made in good faith. Pratt assigned no value to the "corporate tax credit" component of District 26's proposal that the State had made available because that measure did not impact EBIT, even

though Pratt recognized internally that, within this measure, "there is the equivalent value of about $6-7M that would be legitimate to UTC's benefit."  Ex. 62.  Moreover, although it was acknowledged internally that the corporate tax component of the State's offer contained more than $5 million in "real" value, UTC's Head of Human Resources stated he would "feel better if all there is for real savings is the 5m."  Ex. 61.  Perhaps most notably, only five days before the end of the meet and confer period, Pratt officials were inquiring about how Pratt would respond if District 26 actually met its target figure and offered $53.8 million in four-year, recurring savings.  As late as September 8, 2009, a Pratt official was inquiring: "I think I heard rajeev [Bhalla] ask what we would say if the u [Union] came up with the 53 [million dollars].  I didn't hear an answer.  Did anyone respond?"  Ex. 59.  Finally, on September 10, 2009, Chenevert was asked whether he should participate in a call with "the senators."  Chenevert responded that he understood that "[the senator's] request is to not go ahead with Cheshire," which Chenevert stated he "will not support."  Ex. 60.  Chenevert further wrote, "we better wait before we set up the call with him."[49]  Ex. 60.  Even before District 26 had made its last, best, and final offer, UTC's President was firm in his refusal to support any plan regarding Cheshire's future that did not involve closure.  The totality of the record supports the conclusion that, although Pratt claims to have approached the meet and confer period in good faith, Pratt did not approach the meet and confer period as an opportunity to consider District 26's proposal or to pursue the goal of work preservation,

---

[49]  Pratt argues that this merely went to the timing of the call.  See Def.'s Ppd. Fdgs. at 24 n.9 (citing Hess' testimony).  However, Hess testified he "quite honestly [doesn't] recall the context of this email."  Tr. at 1151.

which stands in direct contrast to its duty under Letter 22 and District 26's expectations.

The "spirit of the bargain" behind Letter 22 was that Pratt would make a good faith effort to preserve work within the bargaining unit during the term of the CBA. Pratt materially evaded the spirit of that bargain by formulating its plan to close Cheshire and CARO, and then going through the motions of complying with Letter 22 without making any genuine effort to preserve work. These were not actions taken out of a mistaken view of what Letter 22 required. To the contrary, Pratt understood its obligations, but decisively attempted to evade them. Therefore, District 26 has met its burden of proving that Pratt breached the implied covenant of good faith and fair dealing in Letter 22 of the CBA, and the court finds for District 26 on Count Two.

C.     Injunctive Relief

The remaining issue in this case requires a determination of whether injunctive relief to enforce specific performance is appropriate. District 26 seeks an injunction ordering Pratt to comply with its Letter 22 obligations.

As the parties agree, under section 301 of the Labor Management Relations Act ("LMRA"), codified at 29 U.S.C. § 185, this court has jurisdiction to issue an injunction to enforce the collective bargaining agreement. See District 91, 230 F.3d at 579 ("Various courts have concluded that § 301 authorizes federal courts to issue injunctions to enforce CBAs . . . . Indeed, the legislative history suggests that Congress intended that all conventional judicial remedies would be available in § 301 suits.") (internal quotation marks omitted).

Whether specific performance of the CBA is appropriate turns on a variety factors:

-83-

> It initially requires proof that (1) a valid contract exists between the parties, (2) the plaintiff has substantially performed its part of the contract, and (3) plaintiff and defendant are each able to continue performing parts of the agreement.

Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp., 992 F.2d 430, 433 (2d Cir. 1993). (internal citations omitted).  Here, there is no dispute that the CBA is a valid contract, that District 26 has substantially performed its part of the contract, and that both District 26 and Pratt are able to continue performing the agreement.  Furthermore, "[b]efore specific performance may be ordered, remedies at law first should be determined to be incomplete and inadequate to accomplish substantial justice."  See Leasco Corp. v. Taussig, 473 F.2d 777, 786 (2d Cir. 1972).  The parties have stipulated that, if District 26 can establish a material breach of Letter 22 by Pratt, then District 26 has no adequate remedy at law, and the issuance of an injunction is appropriate.  See Tr. of Oral Arg. at 33, 35.

In light of the applicable standards for determining whether and when injunctive relief can be granted in a § 301 action, and in light of the parties' stipulations, the court concludes that injunctive relief is appropriate.

  D. Other Claims

In its Complaint, District 26 made a claim for money damages and attorney's fees in addition to its claim for injunctive relief.  District 26 has now withdrawn those claims.  Therefore, the court need not address these issues.

## IV. CONCLUSION

For the foregoing reasons, the court finds for District 26 on both of its claims. Pratt has violated its Letter 22 obligation to make "every reasonable effort" to preserve

-84-

the work of the Cheshire and CARO collective bargaining unit members, and it has violated the CBA's implied covenant of good faith and fair dealing.

Therefore, the court hereby issues:

1.    A declaratory judgment that Pratt's announced plans to close the Cheshire and CARO facilities and to move the work performed at those facilities outside of Connecticut constitutes a breach of Letter 22 of the collective bargaining agreement between United Technologies Corporation, Pratt & Whitney, and District 26;

2.    A permanent injunction prohibiting United Technologies Corporation, Pratt & Whitney from implementing the restructuring plans described in the Ruling of February 17, 2010 to move the work presently and normally manufactured by Cheshire and CARO bargaining unit employees to locations outside of Connecticut during the term of the collective bargaining agreement.

**SO ORDERED.**

Dated at Bridgeport, Connecticut this 17th day of February, 2010.


      /s/ Janet C. Hall
Janet C. Hall
United States District Judge